# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

MICHAEL JOSEPH SCHULTZ,
Defendant and Appellant.

S114671

Ventura County Superior Court
CR49517

November 23, 2020

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Cuéllar, Kruger, Groban and Goethals* concurred.

_____

\* Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. SCHULTZ

S114671


Opinion of the Court by Cantil-Sakauye, C. J.


A jury convicted defendant Michael Joseph Schultz of the first degree murder of Cynthia Burger (Pen. Code, § 187, subd. (a)),[1] and found true the special circumstance allegations that the murder was committed while defendant was engaged in the commission of rape and burglary (§ 190.2, subd. (a)(17)(C), (G)). After a penalty phase trial, the jury returned a verdict of death. Defendant moved to modify his sentence to life without the possibility of parole. (§ 190.4, subd. (e).) The trial court denied the motion and sentenced him to death. Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

Cynthia Burger lived in a condominium complex in Port Hueneme, a city located in Ventura County. Around 3:30 a.m. on August 5, 1993, her neighbor was preparing to leave for work and was surprised to see that Burger's garage door was open. Finding that sight unsettling, the neighbor sat in his car in front of Burger's garage. After hearing and seeing nothing for several minutes, he left for work.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

About two hours later, another neighbor awoke to the smell of smoke and saw that Burger's condominium was on fire. Police officers were first on the scene, but they were unable to get far into the home because of the thick smoke. Firefighters soon arrived and quickly extinguished the fire, which was confined to an upstairs bedroom. When firefighters searched the rest of the residence, they found Burger's lifeless body facedown in a half-filled bathtub located on the first floor. Her matted hair was an unnatural yellow-orange color that was coated with a foamy soap-like substance. Fire personnel pulled her from the water and attempted to revive her, but they abandoned their efforts when it was apparent she was dead.

Police officers collecting evidence from the scene found no signs of forced entry. They discovered, however, that the condominium's smoke detectors had been removed or disabled. Burger's sister was called to the scene and informed officers that Burger's purse containing her wallet and credit cards was missing.

Later that day, Ventura County's Chief Medical Examiner, Dr. Ronald O'Halloran, performed on autopsy on Burger's body. Dr. O'Halloran noted that Burger had petechial hemorrhages on the skin of her face, her eyelids, and the whites of her eyes. She also had abrasions under her chin, bruising on her neck, and a fractured hyoid bone. He concluded based on these observations that the cause of death was manual strangulation. Dr. O'Halloran also concluded that Burger was already dead when the fire started because there was no evidence she had inhaled smoke and no evidence of carbon monoxide in her bloodstream.

Dr. O'Halloran examined Burger's genital area and discovered three lacerations in the pubic area and bruising in the lower portion of the vagina. He concluded that Burger had been forcibly penetrated. Dr. O'Halloran swabbed and aspirated Burger's vaginal canal to recover possible seminal fluid. He then conducted a microscopic examination from one of the swabs and observed sperm. He released the swabs and vaginal aspirant to the Port Hueneme Police Department. The material was preserved for future testing.

Two weeks after the fire, an expert in fire reconstruction visited the condominium to determine the fire's point of origin, characteristics, and duration. According to the expert, the fire started when an open flame was applied to synthetic bedclothes at the foot of the bed, erupted quickly, and was rapidly extinguished. The expert concluded the fire was set intentionally.

The investigation into Burger's death went unsolved for several years. In March 1996, three years after the killing, the assistant laboratory manager at the Ventura County Sheriff's Department crime lab contracted with Orchid Cellmark Laboratories (Cellmark) to extract DNA from the vaginal aspirant (also referred to as a vaginal wash) produced by Dr. O'Halloran during the autopsy. Cellmark successfully extracted DNA from the sperm cells present in the vaginal wash and the evidence was returned to the crime lab.

Meanwhile, around the time of the killing, defendant became romantically involved with Therresa Mooney. The two broke up at one point but had resumed dating when defendant was sentenced to prison in 1996 for other crimes. Mooney visited defendant in prison regularly. Defendant's mother,

Bruni Loprieato, had previously been estranged from defendant but often joined Mooney to visit defendant.

In 1999, three years into his prison sentence and six years after Burger's death, defendant was transferred to a low security fire camp. By August of that year, defendant and Mooney were engaged to be married and they expected, incorrectly, that he would be released within six months. Mooney was therefore incredulous when defendant asked her to help him escape.

Mooney testified at trial about her conversations with defendant. She stated that defendant explained to her that prison authorities soon would be taking a DNA sample from him, which might implicate him in a prior crime. Defendant told Mooney that he and a companion were burglarizing a home when the homeowner awoke and confronted them. Defendant claimed the homeowner cut him on the forearm with a butcher knife as defendant attempted to flee, and that his companion then killed the homeowner.

Defendant feared he would be held responsible for the homeowner's death, and asked Mooney to bring a car and to meet him outside the fire camp between bed counts. He explained that he wanted Mooney to give him a ride to a bus station or airport, and that he might flee to live with a relative in Germany. Mooney refused defendant's request to help him escape, saying that he should not run from the situation because "if that's really the way it happened," defendant would not be charged.

Mooney testified that she visited defendant about one week later, this time accompanied by Loprieato. On the drive to the fire camp, Mooney told Loprieato about defendant's request

for help to escape. Both women were angry and hurt, and they made clear to defendant they would not assist him in escaping. At one point during the visit, Loprieato went to the bathroom and Mooney told defendant that she loved him and was "there for [him]," but that she was skeptical of his story. Mooney asked defendant whether he had killed someone. Defendant said that he had. Prompted by a "weird feeling," Mooney asked whether the victim was a woman and whether he had raped her. Defendant again said yes. He then told Mooney that the victim's name was "Cindy Burger" and that the killing happened on August 4 or 5, 1993. He suggested that Mooney search the local newspapers for coverage of Burger's death, saying that he had set a fire during the incident and that it was covered in the news. Loprieato then returned, and the group resumed talking about defendant's plan to escape. Neither Mooney nor defendant mentioned Burger to Loprieato at that time.

Mooney stated that when she left the fire camp, she and Loprieato agreed not to tell anyone about defendant's plan to escape. Mooney did not tell law enforcement about the plan or defendant's admission regarding Burger's death because she was afraid and "wanted it to all be not true." She eventually went to a library and located a newspaper article about the killing. She brought the article with her when she visited defendant the following weekend. Mooney gave defendant the article to read. At one point, he stopped reading and said the article was wrong in stating that Burger had been wearing a nightshirt. Mooney read the rest of the article to defendant and demanded that he tell her what happened. Defendant agreed and answered Mooney's questions regarding the circumstances surrounding the rape and killing.

Mooney also testified that defendant told her that he had used a lot of methamphetamine earlier in the day and stumbled upon Burger's open garage between 2:30 and 3:00 a.m. He said he entered the garage intending to steal something, but then found a key that unlocked the door separating the garage from the residence.[2] He went inside, looked around the first floor, went upstairs, found Burger nude on her bed, and raped her. When Mooney asked defendant if Burger fought back, he said, "No, actually she seemed to like it." Defendant told Mooney that at one point Burger scratched either his face or his chest. Mooney recalled that sometime around August 1993 she had seen marks on defendant's face.

Defendant answered more of Mooney's questions about the killing. Defendant explained that he had smothered Burger with a pillow and that he killed her because he was "too identifiable." He said that he placed Burger's body in the downstairs bathtub and filled it with water, bleach, and other household chemicals to "kill any DNA." Defendant told Mooney that, fearing he could be identified by DNA from hair or sperm on Burger's bed, he went back upstairs and used a candle to light the bed on fire. He also explained that before leaving the scene, he took some items to make it appear that Burger's residence had been burglarized.

After defendant had answered Mooney's questions, she mentioned that her friend knew a City of Ventura Police Department employee who, for a fee, could check to determine

---

[2] Mooney admitted at trial she had testified during the preliminary hearing that defendant told her he did not have a plan concerning what he was going to do when he entered Burger's home.

whether any DNA evidence had been recovered from the crime scene. She asked defendant not to attempt an escape until she could obtain that information. Defendant agreed, telling Mooney to ask Loprieato for the money. Mooney later gave her friend $100 for the information; the friend reported that the DNA from the case "wasn't legible," and Mooney communicated the "good news" to defendant by telephone. Defendant then asked Mooney to tell Loprieato about the crime.

Mooney further testified that during a subsequent drive to visit defendant she disclosed to Loprieato what defendant had told her about killing Burger. When Loprieato arrived at the fire camp, she tearfully asked defendant whether what Mooney told her was true. Defendant said, "Yes, mama, it is." Mooney and Loprieato decided they would not tell anyone about the crimes.

Loprieato also testified at trial. She admitted that defendant had asked for her help escaping from the fire camp but asserted that she repeatedly refused to help him. She denied that defendant told her he wanted to escape because of any concern regarding DNA, but she admitted he said that something he had done in the past was going to "backfire" on him. Loprieato also denied that defendant ever confessed to her that he had raped and killed Burger. She did, however, admit that Mooney had told her about defendant's confession and the possible DNA evidence during one trip to visit defendant, that she believed Mooney, and that she had no reason to think Mooney would lie about the confession. When Loprieato approached defendant at the fire camp that day, she said to defendant, "[W]hat have you done?" He proceeded to cry, put his head down, and walk away.

Loprieato agreed that she and Mooney made a pact not to tell anyone about defendant's confession. Loprieato testified that although defendant never personally told her he had committed the crime, he also never told her he had not killed Burger. Similarly, Mooney testified that defendant continued to write to her after he was implicated in Burger's death and leading up to his capital trial, but that he never denied killing Burger.

In August 2000, one year after defendant had disclosed to Mooney the details of Burger's rape and killing and several months before defendant's expected release from the fire camp, Mooney told her daughter about defendant's confession. Mooney's daughter told Mooney to call the police, or she (Mooney's daughter) would. That day, Mooney placed an anonymous call to the City of Ventura Police Department to report that she had information regarding Burger's death.

In October 2000, investigators contacted Loprieato and asked her about Burger's death. Loprieato denied knowing anything about the incident. After she spoke with investigators, Loprieato met with Mooney at a restaurant. Unbeknownst to Loprieato, Mooney was wearing a recording device. Loprieato told Mooney that she was "playing dumb" when she spoke with investigators, and that she would deny knowing anything about Burger's death. She reported that she had talked to defendant about Burger's death, saying, "I said to [defendant] what in the world possibly could have happened to him to murder somebody?" And she told Mooney that telling the police anything "is not helping you and it's not helping him. And you know something, I think to myself fuck the system. Do you know how many people who have money would have gotten away with it?" At trial, Loprieato admitted to making those

statements, although she denied talking with defendant directly about the killing, saying her statement was taken out of context. She explained, too, that she was upset, trying to comfort a "hysterical" Mooney, and attempting to protect her son.

Later in October 2000, Loprieato became extremely distraught about Burger's death. She talked with a family friend, Alan Bice, about whether to be truthful with law enforcement about what she knew. Bice told Loprieato she should be honest with investigators. Bice also testified that Loprieato told him that defendant had admitted to her that he had killed a woman.[3] Six days later, Bice spoke with investigators regarding his conversation with Loprieato. Later that day, Bice accompanied Loprieato to the prosecutor's office where she talked with investigators and related what she knew.

About one month later, investigators obtained blood samples from defendant. The blood samples were sent to Cellmark, where they were compared with the DNA collected from sperm found during Burger's autopsy. DNA testing showed the likelihood that the sperm collected during Burger's autopsy came from a Caucasian other than defendant was one in 24 times 10 to the 18th power. In other words, the DNA evidence showed a match.

---

[3] On cross-examination, defense counsel pointed to statements Bice made to law enforcement in an attempt to cast doubt on Bice's testimony. Bice acknowledged that some of his prior statements were ambiguous but maintained at trial that Loprieato had told him that defendant personally confessed to her.

### 2. *Defense evidence*

The defense presented no affirmative evidence at the guilt phase of trial.

## B. Penalty Phase Evidence

### 1. *Prosecution's case in aggravation*

The prosecution's case in aggravation included testimony and documentary evidence regarding defendant's prior convictions and various uncharged acts of violence or threats of violence. In addition, three of Burger's family members described how Burger's death had affected them.

### a. *Prior convictions*

The jury learned that defendant had been convicted of residential burglary in September 1992, that he was initially sentenced to probation but eventually sent to prison in December 1992, and that he was released on parole in June 1993.

The jury also learned that in 1996, three years after the killing, defendant pleaded guilty to six charges, including second degree burglary, felony battery resulting in serious bodily injury to a police officer, being under the influence of a controlled substance, and other misdemeanor offenses. These convictions stemmed from an incident that occurred on the Ventura campus of California State University, Northridge. Two officers, Thomas Avery and Alex Marquez, discovered defendant using tools to break into a vending machine coin box in the student lounge. According to the officers, they drew their guns and ordered defendant to put down his tools and lie on the floor. Defendant dropped the tools, but then ran at full speed

toward the officers and was able to slip between them.[4]  The officers chased defendant down several hallways and a flight of stairs, cornering him inside an underground parking garage. During the pursuit, the officers unsuccessfully used pepper spray and baton strikes to attempt to stop defendant.  At one point they held defendant down on the ground of the garage with both officers on top of him.  Defendant managed to hoist himself up into a squatting position and move toward a door leading outside the garage.  Defendant opened the door, and he and the officers tumbled onto the ground outside.  Defendant continued to struggle to get away while Avery and Marquez held him down, striking him each time he attempted to get up. Defendant was subdued and handcuffed only after five additional officers arrived and assisted in the arrest.  The parties stipulated at trial that a sample of defendant's blood that was taken on the day of the incident tested positive for methamphetamine.

Officer Marquez testified that several times during the incident defendant reached for or grabbed Marquez's holstered sidearm, leading Marquez to fear for his life.  Officer Avery testified that he never saw defendant reach for Marquez's firearm; he acknowledged that there were times when Officer Marquez and defendant were out of his sight, and that he would have been watching for defendant to reach for the firearm. Officer Marquez, for his part, stated there was "no doubt in [his] mind" that defendant was reaching for his firearm.  He described the incident as "the most violent confrontation I had in my entire life."  As a result of the injuries he suffered during

---

[4]    Officer Marquez testified that defendant did not drop the tools until he (Officer Marquez) struck him in the chest with a police baton.

the arrest, Officer Marquez had to undergo eight surgeries on his knees and one on his back. Officer Avery said he had never been involved in a struggle that was so violent; he dislocated a finger while punching defendant to keep him subdued.

### b. Uncharged crimes of violence

The prosecutor called several witnesses to testify about prior uncharged incidents involving violence by defendant.

Michael Hecht testified that he met defendant in April or May of 1989 when Hecht moved from Las Vegas to Redlands, California. Hecht's mother was dating defendant's father at the time, and Hecht and defendant worked at defendant's father's refrigeration repair business; Hecht slept on a couch at the business. That June, defendant's father abruptly demanded Hecht leave. As Hecht was gathering his possessions, he asked his mother to leave with him because she and defendant's father had been fighting. Defendant and his father later attacked Hecht and beat him, saying, "you're dead." Defendant grabbed Hecht around the neck with one arm and punched him repeatedly in the face with the other arm. At one point, after Hecht had been wrestled to the ground, defendant banged Hecht's head against the pavement. Defendant's father told defendant that he was going to retrieve a firearm. Hecht responded by slashing at his attackers with a pocketknife and eventually was able to get away. He suffered a dislocated jaw, a bloody nose, a concussion, and rib injuries.

Defendant's stepfather, Nick Loprieato,[5] testified about another incident that occurred in early 1991. He stated that he was upstairs in the family home when he overheard defendant and defendant's mother arguing over defendant's use of the family's washing machine. When Mr. Loprieato told defendant that he "ought to respect [his] mother," defendant grabbed him, placed him in a chokehold, and said, "I could hurt you if I want to." Defendant's mother called the police. A police officer testified that Mr. Loprieato reported that defendant had threatened to kill him, although at trial Mr. Loprieato said he did not remember such a threat.

Therresa Mooney also testified about several incidents involving defendant's acts of violence. One incident occurred around September 1993 at the beginning of their relationship when defendant became angry with Mooney for socializing with a male friend at a beach party. According to Mooney, she and defendant argued, and defendant and the man got into a scuffle. When defendant went to his car, Mooney's friend picked up a metal pipe that was part of a trampoline to defend himself. Defendant then drove at Mooney's friend, who "kind of hit the front of the car . . . [and] jumped and rolled over the side of the car . . . ." Mooney's daughter gave a similar account of the incident.

Mooney also described defendant's assaults on her. On one occasion in late 1994, defendant and Mooney were in a car accident together and Mooney was in intensive care for two weeks. After she was released from the hospital, she and

---

[5] To avoid confusion, this opinion refers to Nick Loprieato as "Mr. Loprieato" and refers to defendant's mother, Bruni Loprieato, as "Loprieato."

defendant argued over his drug use and he kicked or kneed her in the buttocks. During a later argument over defendant's drug use, he kneed Mooney in the buttocks, hitting her tailbone. In an incident that occurred after Mooney had broken off the relationship due to defendant's continued drug use, defendant ingested methamphetamine, took Mooney's house and car keys, refused to return them to her, and twisted her hand backward when she confronted him. Mooney's daughter called the police. Mooney also testified that on one occasion when defendant was trying to convince Mooney not to end the relationship, he threatened to smash her television. She was able to convince him to leave her house, and she closed and locked the door. Defendant then broke through the door, knocking her down in the process.

Mooney also testified that in early 1995, after she and defendant separated, she went on a date with a man named Darryl Allen. When she returned home with Allen after the date, defendant rushed at the car yelling at Allen and pulled Allen from the vehicle. Allen retrieved a sledgehammer handle from the back of his car, and he and defendant struggled. Defendant put Allen in a chokehold and was able to take control of the sledgehammer handle. Allen got back into his car to leave, and defendant broke the car windshield with the handle. Mooney's daughter corroborated this account, including that defendant broke Allen's windshield. Allen testified and provided a slightly different account of the events. Allen stated that he drove to Mooney's house alone and saw defendant and Mooney arguing in the street. Allen exited his car, and defendant started yelling at him, ripped Allen's shirt from his body, and punched Allen in the head. Allen then retrieved the sledgehammer handle from his car, and defendant put him in a

chokehold. Allen could not say how his car windshield had been damaged; he believed it may have occurred when he was retrieving the sledgehammer handle and defendant grabbed him.

Richard Bowens described an incident from April 1995 in which defendant became angry with Bowens' girlfriend concerning her failure to repay a $5 debt. Defendant grabbed her shirt collar and shook her, prompting the woman to call out for help. Bowens came between defendant and the woman and told defendant that she would repay the debt when she could. As defendant walked away, however, he turned and threw a punch at Bowens that "grazed" his cheek. Police responded but no charges were filed; Bowens said that he did not pursue the matter after defendant begged him not to.

### c. Victim impact evidence

The prosecution called Burger's father, mother, and older sister to testify regarding the effect Burger's death had on them individually and as a family. Burger's father, Had, testified that his daughter's death left him with a feeling of emptiness. Burger's mother, Virgie, described the pain she felt after learning of the killing. And Burger's sister, Sandra, described the bond she had with her sister and her reaction upon hearing of her sister's death.

### 2. Defense case in mitigation

The defense case in mitigation included testimony from defendant's family members, expert witnesses, and lay witnesses. Defendant's family members described defendant's upbringing in an environment of drug abuse and domestic violence, the mental abuse inflicted on him and his siblings by his father, and defendant's use of drugs beginning at an early

age. Other witnesses testified regarding defendant's heavy drug use and addiction to methamphetamine during his adult years and the behaviors he exhibited in connection with that addiction. The defense also presented testimony from an expert in addictive medicine and expert testimony from a psychologist regarding how an individual can be affected by witnessing and experiencing domestic violence as a child. Finally, the defense called several lay witnesses and a penology expert to testify regarding defendant's prospects for a successful adjustment to life in prison without the possibility of parole.

### a. Defendant's upbringing and family background

Defendant's half sister and brother described growing up in a household beset by parental neglect, drug abuse, and frightening domestic violence perpetrated by defendant's father.

Defendant's mother was the family's primary income earner and she spent long hours working as a hairdresser. From a young age, defendant and his brother were generally left in the care of their sister, who was five years older than defendant. The children were often left alone at night.

Defendant's father punished the children frequently, and all three children were punished for the digressions of one. His methods included beating them with a belt and forcing them to kneel on the kitchen floor for lengthy periods of time. Defendant's father would belittle the children, often in an interrogation-like setting that lasted for hours. According to defendant's sister, it was common practice for her and her brothers to be awakened in the middle of the night for punishment and then to be forced to stay awake. She described their existence as akin to living in "a hostage situation" with a

"sort of terrorist" because they had no idea what was going to anger their father.

Defendant's siblings testified that defendant's father also forced the three children to witness the physical abuse he inflicted on their mother. For example, in the children's presence and while in a drunken rage, defendant's father pummeled their mother with his fists after she had mentioned the possibility of a separation. Defendant's sister remembered another incident that occurred after their mother had fled the home. After their mother had driven off, their father placed the three children in his car to hunt her down, telling the terrified children he would kill their mother when he found her. Defendant's brother described another occasion after their mother had fled the house with their sister. Their father grabbed his shotgun and put defendant's brother and defendant in the car, telling them that something bad would happen to the boys if he could not find their mother.

Defendant's siblings further testified that their father used illegal drugs in the home, and would ingest "speed" and cocaine in front of them. With his ever-increasing drug use, their father became more paranoid and began threatening the children with the firearms he kept at home.

According to defendant's brother, beginning when defendant was nine or 10 years old, he and defendant would experiment with their father's drugs, including "speed" and marijuana. Around that time, they also started drinking hard alcohol and beer. Defendant's sister recalled that the drugs made defendant agitated, and that he and his brother would hit and burn each other with cigarettes when they were under the influence.

Defendant's sister also testified that her father had sexually molested her beginning when she was eight or nine years old. To avoid him, she would often sleep in her brothers' bedroom, sometimes under the bottom bunk bed. She kept the molestations a secret. Defendant's brother recalled that his sister would occasionally sleep in the room he shared with defendant. He remembered that on one of these nights their father came into the room, drunk, around 2:00 or 3:00 in the morning and lay down next to their sister. When their father put his arm around her and said he loved her, defendant's brother stirred loudly, as if he had just woken up, and then got out of bed to walk to the bathroom. As he walked out, he overheard his sister say to their father something like, "It's not right."

When defendant's sister was about 17 years old, she heard defendant's father trying to enter the locked door to her bedroom. When she saw that he had then gone outside the house to try to break into her room through the window, she fled to a bathroom and locked the door. Her father, who was clad only in his underwear, began banging on the bathroom door yelling for her to come out. The commotion brought defendant and his mother and brother to the scene, and they observed defendant's father punch a hole through the bathroom door to get inside. Defendant's sister cowered in the corner, crying and shaking. Defendant's mother testified that when she angrily asked her husband what was going on, he threatened her.

A short time after that incident, defendant's sister permanently left the home. Two or three weeks later, after defendant's father threatened to kill defendant's mother if she did not bring defendant's sister back, defendant's mother moved out of the house and filed for divorce.

Defendant and his brother were 12 and 14 years old, respectively, when their mother and sister departed. The boys were left mostly in the care of their father, who provided them with no structure, control, or stability. Defendant and his brother moved from place to place with their father. During this time, defendant used cocaine, methamphetamine, and other drugs, sometimes with his father. By then, defendant had stopped going to school and would often hang around at an arcade.

After defendant's parents divorced, defendant's father became romantically involved with Jacqueline White. Defendant and his father lived with White when defendant was about 15 years old. She testified that during the time defendant and his brother resided in her home, defendant was quiet and considerate, and very nurturing to her young son. White was distressed by the abuse and punishment that defendant's father imposed on his sons, and she eventually became the target of his wrath as well. On one occasion after defendant's father and his sons had moved to a different residence, they came to stay with White for the weekend. During the evening, defendant's father became enraged and pushed White up against a wall. Defendant stepped in, pulled his father off of White, and managed to get him to stop the attack. White described another similar incident when defendant stepped in to protect his brother from their father's abuse.

Defendant's paternal aunt testified that her father (defendant's paternal grandfather) was abusive, controlling, and unpredictable, and that she, defendant's father, and their mother had been subjected to the same type of abuse that defendant's father later meted out to his own wife and children.

### b. *Defendant's drug use as an adult*

Defendant's mother testified that when defendant was about 18 years old he came to live with her and her new husband. She asked defendant to leave, however, after his drug use became more frequent and he had refused to attend the airline mechanics school in which they had enrolled him.

Kenneth Ross testified that he first met defendant when defendant was in his early twenties. At that time, Ross found defendant to be a helpful and humble person who enjoyed down-to-earth pleasures like walking on the beach and taking their dogs out to play together. Several years later, Ross started supplying defendant with methamphetamine. For the next three or four years, they regularly used the drug together.

Ross explained that when he (Ross) was under the influence he became a "totally different" person, doing things he would never think of doing while sober. Ross also described the changes he noticed in defendant's personality after regular use of methamphetamine. Specifically, Ross found defendant was less likely to be helpful or generous. Instead, defendant grew cold and self-absorbed. And when the effects of the drug were wearing off, defendant could be intimidating and even aggressive. Ross related that on one occasion, defendant knocked him to the ground.

Defendant's friend, Chad Hoffman, described similar observations. Hoffman testified that he used methamphetamine regularly with defendant, and that defendant would often become quiet, grumpy, and even aggressive when the effects of the drug were wearing off.

Other evidence regarding defendant's drug use was provided through the testimony of the probation officer who

prepared a presentencing report in connection with defendant's 1996 guilty plea. During the interview with the officer, defendant blamed the incident on his use of methamphetamine. In summarizing his lengthy history of drug addiction and abuse for the officer, defendant indicated that beginning at 15 years old he snorted cocaine on a monthly basis, and that between the ages of 22 and 24 his use of this drug increased significantly until he was incarcerated. Defendant also reported that between the ages of 15 and 20 he smoked marijuana daily. And, with regard to his use of methamphetamine, he told the officer that in his early twenties he snorted or smoked one-quarter gram of methamphetamine every day.

### c. Defense expert testimony

#### i. Drug addiction

The defense called as a mitigation witness an addiction medicine expert, Alex Stalcup, M.D., who provided the jury with detailed information about drug addiction and its effects. He explained that a "drug of abuse" is a chemical that overstimulates the neurotransmitters of the brain's pleasure centers. Such overstimulation changes the brain's physiology by damaging the pleasure systems, which in turn interferes with the drug addict's ability to experience pleasure without the use of drugs. For a drug addict, the overstimulation of the pleasure center's neurotransmitters leads to the need for a higher dose of the drug to achieve the same high, and with that need comes the inability to control or stop their drug use. And because drug addiction renders an individual incapable of experiencing pleasure without drugs, he or she avoids sobriety, which becomes a state of emptiness and boredom that can become intolerable.

Dr. Stalcup further explained that factors such as genetic makeup and life experiences can predispose an individual to drug addiction.  For example, when children use drugs during a tumultuous time the drugs not only make them feel good but also allow them to escape the turmoil.  The social context of a child's first use of drugs is also significant to predisposition because a home or peer group environment that supports drug use enables the child to obtain enough drugs to damage his or her brain's ability to experience pleasure.

Dr. Stalcup also discussed the factors that can lead a susceptible person to become an addict.  According to Dr. Stalcup, "early onset use" of a high potency drug before 15 years old, when the brain's pleasure centers are still developing, presents a dangerous factor for progression toward addiction. Another significant factor, he explained, is childhood trauma, be it physiological, physical, or sexual.

With regard to the use of methamphetamine specifically, Dr. Stalcup characterized it as a "much too powerful" drug that if used over any extended period of time, particularly if smoked or injected, will demonstrably injure the user's pleasure centers. According to Dr. Stalcup, studies have shown that some methamphetamine users exhibit aggressive behavior because the drug simulates the fight-or-flight response caused by adrenaline.  A methamphetamine user may become apprehensive and hypervigilant, seeing a threat that does not exist.  Dr. Stalcup also opined that methamphetamine users do not exercise free will but that, when intoxicated, they do what the drug tells them to do.  He further asserted that, in the case of someone who committed a rape-murder, the drug "created conditions that [a rape-murder] would happen."

Based on his review of the transcripts of the guilt phase and interviews with defendant's family members, Dr. Stalcup believed that defendant was addicted to methamphetamine and probably addicted to marijuana at the time of his 1996 arrest. In explaining that opinion, Dr. Stalcup reviewed the various risk factors shown by this evidence. For example, he found that defendant's family history of drug use showed he had a "high genetic load" for addiction. He also observed that defendant was raised in a household where he, his siblings, and his mother suffered psychological abuse and brutal physical assaults. In Dr. Stalcup's view, incidents such as those described by defendant's family members are associated with feelings of hopelessness, which further served to predispose defendant to addiction. Dr. Stalcup also supported his opinion with evidence that defendant snorted speed when he was 10 or 11 years old, at a time when his brain function was not fully matured. This suggested to Dr. Stalcup that the effect of that drug would be much more potent than had it been ingested when defendant was older.

Dr. Stalcup also found significance in the prevalence and casualness of drug use in the household, which further enabled defendant's ingestion of drugs. Dr. Stalcup believed that the description of the events that unfolded in 1996, when he fought back violently against the officers who were attempting to apprehend him, was a classic example of the methamphetamine fight-or-flight phenomenon. Finally, in Dr. Stalcup's view, the testimony by defendant's friends regarding defendant's dark mood when coming off the effects of methamphetamine was like that of the addict who believes the way he or she feels without the drug to be intolerable.

### ii. Impact of child abuse

The defense also called Bruce Gladstone, Ph.D., to testify regarding the destructive behaviors that can be set in motion as a result of growing up in an abusive environment. According to Dr. Gladstone, the formative years of childhood are important to the development of an individual's brain and adult personality. Child abuse can result in dysfunction later in life, including cognitive and psychiatric problems.

Dr. Gladstone characterized as child abuse many of the incidents that occurred during defendant's upbringing, such as witnessing the repeated beating of a parent, being left alone and unsupervised, being beaten with a belt for a minor infraction, and being exposed to drugs left around the house in accessible places. As Dr. Gladstone explained, without a mentor or positive role model outside the household, many children growing up in an abusive environment tend to model the behaviors that they see in their adult caretakers. They can develop low self-esteem, poor impulse control, and an increased likelihood for drug addiction as a result of the abuse. The more severe the abuse, the more severe the damage to the child's development.

### iii. Prospects for a positive adjustment to life in prison

The defense called Anthony Casas, a former associate warden for the California Department of Corrections and Rehabilitation, as a penology expert to offer his opinion regarding whether defendant would make a positive adjustment if sentenced to life without the possibility of parole. According to Casas, the record of an individual's behavior in prison prior to a capital offense is the best indicator of that person's future

behavior in prison. Casas opined that neither defendant's conviction for Burger's rape and murder nor his asking for help to escape from fire camp would factor into the determination concerning whether defendant would adjust well in prison.

After reviewing defendant's prison and jail records, including his work and disciplinary history, Casas expressed the view that defendant would serve out a life sentence as an obedient and peaceful inmate. He found it significant that defendant worked and completed a vocational training program while housed in a high security prison after his 1996 convictions. Only one year later, defendant's behavior allowed him to be transferred to the Sierra Conservation Center to train as an inmate firefighter. On his successful completion of that program, Casas explained, defendant was assigned to the Mount Gleason Fire Camp, which meant he was being housed in a facility with the least secure level of custody. As Casas described it, individuals selected for the fire camps "are considered the A students of the prison population." As for defendant's rules violations at the fire camp and while in custody in county jail awaiting trial in this case, Casas noted that the records showed only minor infractions (including smoking cigarettes and being out of bounds), and that none involved violence against staff or other inmates. Casas did note one incident in 1998 when defendant caused a large boulder to fall down a hill, leading the rest of the crew to take cover to avoid being hit. Casas acknowledged that defendant was belligerent and disrespectful when counseled about the incident.

Finally, the defense presented four witnesses who supervised defendant when he worked at the fire camp. Corrections Lieutenant Gregory Sims described defendant as an "average" inmate, noting that defendant had earned prestigious

positions on the fire crew but was also counseled several times for incidents including smoking and failing to show up for count. Charles Lovers, the firefighter foreperson at the fire camp, testified that defendant earned the position of first sawyer on the fire crew. Although defendant was once relieved of his duties for not following Lovers' directions and creating an unsafe environment during a fire, Lovers believed defendant worked well and had a good attitude. Fire Captain John Bailey supervised defendant during 24-hour shifts fighting a fire on Catalina Island. Bailey remembered defendant as having done an outstanding job and found that he demonstrated leadership abilities. Firefighter Michael Bernal also supervised inmates at the fire camp. He testified that defendant served as a tool man responsible for sharpening the firefighting tools. Bernal explained that the position was a coveted one at the fire camp that required the approval of all eight of the camp's supervisors.

### 3. *Prosecution rebuttal evidence*

The prosecution called several rebuttal witnesses to challenge the defense case in mitigation. Former police officer Donald MacNeil, a narcotics expert, disagreed with Dr. Stalcup's assertion that methamphetamine use renders a person unable to exercise free will. In MacNeil's opinion, defendant's ability to think through and execute actions to cover up the rape and murder, such as dismantling the smoke detectors, filling the bathtub with chemicals, and setting the bed on fire to destroy possible genetic material showed a "remarkable" presence of mind.

The prosecution also presented evidence to rebut testimony regarding defendant's prospects for a positive adjustment to prison life. Dennis Fitzgerald, an investigator

with the Ventura County District Attorney's Office, testified that defendant got a "white pride" tattoo while in custody sometime after his 1996 arrest. Fitzgerald also told the jury that while awaiting trial in the present case defendant corresponded with Justin Merriman, once a leader of the Ventura-based Skinhead Dogs white supremacist gang. One letter showed that defendant referred to Merriman as "homey," ended his correspondence with the phrase "Long respects," and asked Merriman to keep in touch. Letters from Merriman to defendant showed that Merriman referred to defendant as "homey," "Big Mike," and "brother." Merriman ended his letters with the phrase, "With respect."

### C. The Parties' Theories of the Case

The prosecution argued during both the guilt and penalty phases that defendant had intentionally targeted Burger's home, knowing that she was "an attractive woman who lived alone."

Defense counsel conceded during the guilt and penalty phase that defendant had raped and killed Burger. Counsel argued, however, that defendant did not target Burger specifically, but entered her home looking for items to steal when he saw her garage door open. Defense counsel asserted that defendant was under the influence of methamphetamine at the time of the crime and characterized the crime as "a random act committed by a man high on methamphetamine." The prosecution contested that defendant was under the influence when the crime occurred, calling the killing "well planned, deliberate, [and] organized."

## II. JURY SELECTION ISSUES

### Excusal of Two Prospective Jurors for Cause

Defendant asserts that the trial court excused two prospective jurors for cause in violation of the constitutional standards set forth in *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*) and *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*). We find substantial evidence supporting the excusals and uphold the trial court's rulings.

#### 1. *Governing principles*

Under state and federal constitutional principles, a criminal defendant has the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) With regard to jury selection in a capital case, decisions by this court and the United States Supreme Court have made clear that prospective jurors' personal opposition to the death penalty is not a sufficient basis on which to remove them from jury service in a capital case, " 'so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " (*People v. Stewart* (2004) 33 Cal.4th 425, 446, quoting *Lockhart v. McCree* (1986) 476 U.S. 162, 176; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 863.) Excusal for cause is permissible, however, when the prospective juror's beliefs regarding the death penalty "would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with [the court's] instructions and [the juror's] oath.' " (*Witt, supra,* 469 U.S. at p. 424, quoting *Adams v. Texas* (1980) 448 U.S. 38, 45 (*Adams*); see also *People v. Ghent* (1987) 43 Cal.3d 739, 767 [adopting the *Witt* standard].)

We review a trial court's excusal of a prospective juror for cause to determine " 'if it is fairly supported by the record.' "

(*People v. Thomas* (2011) 51 Cal.4th 449, 462, quoting *People v. Mayfield* (1997) 14 Cal.4th 668, 727.) " 'In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting.' " (*Ibid.*, quoting *People v. Fudge* (1994) 7 Cal.4th 1075, 1094.) In such cases, "the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10, citing *People v. Wilson* (2008) 44 Cal.4th 758, 779; see also *Utrecht v. Brown* (2007) 551 U.S. 1, 9 [deference to the trial court's ruling on a challenge for cause is appropriate because that ruling is based in part on the court's ability to assess the prospective juror's demeanor].)

### 2. *Jury selection process*

The trial court began the jury selection process by providing several groups of prospective jurors a brief introduction to the case, including the nature of the charges, the structure of a capital trial, and general principles of law. After the court excused some of the prospective jurors for hardship, it directed those who remained to complete a 93-item questionnaire. About one week later, after the court and the parties had reviewed the questionnaires, approximately 70 prospective jurors assembled in the courtroom. After the first 12 prospective jurors were seated in the jury box, the court described for the entire courtroom a juror's duty in a capital case. For example, the court explained that a juror "must accept and follow the law as I state it to you regardless of whether you agree with the law."

The court began voir dire questioning by asking each of the 12 individuals seated in the jury box whether he or she had

any reason to believe he or she could not be fair and impartial to both sides in the case. After excusing some of the 12 prospective jurors for cause on its own motion and replacing them, the court permitted counsel for both sides to question the prospective jurors about their questionnaire responses. Neither party challenged any of the first group of prospective jurors for cause. The parties were then given the opportunity to exercise peremptory challenges. The prosecutor exercised one peremptory challenge, and another prospective juror was called to the jury box. The court asked the newly seated prospective juror the same question it had asked the first group — whether she could think of any reason why she could not be a fair and impartial juror — and then permitted the parties to question the prospective juror, to challenge for cause, and to exercise peremptory challenges.

Jury selection proceeded in this manner for three days until 12 jurors and two alternates were accepted by the parties and empaneled. During this process, Prospective Juror A.A. was excused for cause at the prosecutor's request, and Prospective Juror M.M. was excused for cause on the court's own motion.

### 3. Discussion

#### a. Prospective Juror A.A.

Prospective Juror A.A.'s questionnaire answers indicated that his opinion regarding the death penalty vacillated between strong and mild opposition. For example, A.A. stated that his views on the death penalty were influenced by his Catholicism, and he characterized the death penalty as "unbiblical." When asked to choose where he stood on a numerical scale of one to 10, with 10 being strongly in favor of having a death penalty and

one being strongly opposed, A.A. circled the number three and commented that he was "kind of against but [not] sure what [I'm] gonna do." But he also answered "Yes" to the question whether he had strong feelings on the use of capital punishment, and included a comment that he was "against [the] death penalty." When asked what purpose, if any, he believed was served by the death penalty, he answered, "None."

A.A.'s questionnaire answers also provided conflicting responses to questions regarding his ability to serve as a juror. When asked whether his religious or moral views would make it difficult for him to be a fair juror in a death penalty case, he checked "Yes." He also checked "Yes" when asked whether his feelings against the death penalty were so strong that he would always vote against it. At the same time, however, A.A. marked "Yes" when asked whether he believed he could be open minded about the penalty and whether he was willing to weigh and consider all of the aggravating and mitigating evidence before deciding the appropriate punishment.

When A.A. was called to sit in the jury box, the court asked him, "Do you believe you can be a fair and impartial juror to both sides in the case?" A.A. responded that he was "pretty sure" he "could be fair in the first phase. But the second phase — you know, I kind of don't believe in the death penalty." During questioning by the prosecutor, A.A. elaborated on some of his questionnaire answers. He explained, for example, that he was against the death penalty but that "inside this court, you know, I will follow the instruction, you know," and, "I think I can follow it, yeah." When asked about his comment that he would always vote against the death penalty, he stated, "I think I could — you know, I could — as I said, I could follow the instruction, you know. I would — I will try, you know, to be fair, you know, and

follow the judge['s] instructions. That's all I can do, you know." And when asked if he could actually sign a verdict form stating defendant should be put to death, A.A. responded that after considering other jurors' views, "probably I could — I could do that, yes" and, "Yes, I could sign." The prosecutor ended his questioning by asking A.A., "If you have a choice between life in prison and the death penalty as the two punishments, would you always pick life in prison?" A.A. replied, "Well, if I have a choice, you know, I would always pick life in prison."

The prosecutor challenged A.A. for cause, and the trial court granted the challenge. Defense counsel objected, arguing that A.A. stated repeatedly that he could consider death as well as life without the possibility of parole. The court explained that A.A. indicated on his questionnaire and during questioning that, if given the choice, he would always choose life without the possibility of parole over the death penalty. In the court's view, that answer, in combination with A.A.'s equivocal responses to the prosecutor's questions and his deeply held religious convictions, rendered A.A. unable to consider imposition of the death penalty "as any possibility." Defense counsel offered a different interpretation of A.A.'s statement, understanding A.A. to have meant that he would choose life without the possibility of parole if he had a choice, but that A.A. recognized that "he didn't have a choice. He had to follow [the court's] instructions." The court rejected that interpretation of A.A.'s response, observing that the jurors would, in fact, have a choice: "The Court is not going to instruct the [jurors] they must vote for death or must vote for life without the possibility of parole."

While a prospective juror may not be excused for cause based on "general objections" or "conscientious or religious scruples" against the death penalty (*Witherspoon, supra,*

32

391 U.S. at p. 522), excusal is proper when a prospective juror cannot "consider and decide the facts impartially and conscientiously apply the law as charged by the court" (*Adams, supra,* 448 U.S. at p. 45). When a prospective juror's views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" the juror may be excused for cause. (*Ibid.*)

The record supports the trial court's determination that A.A.'s responses reflected a substantial impairment in his ability to perform his duties as a juror. His juror questionnaire responses revealed conflicting views on his ability to impose the death penalty. Although he stated that he was willing to consider all aggravating and mitigating evidence before deciding the appropriate punishment, he also stated that his feelings against the death penalty were so strong that he would always vote against it. During questioning by the court, A.A. stated he was "pretty sure" he could be "fair" during the guilt phase, "[b]ut the second phase — you know, I kind of don't believe in the death penalty." This response suggests that A.A. doubted his ability to be fair during the penalty phase; he felt he could be fair during the guilt phase *but* during the penalty phase his opposition to the death penalty could prevent him from being fair. An inability to be "fair" during the penalty phase would substantially impair the performance of A.A.'s duties as a juror. (See *Adams, supra,* 448 U.S. at p. 45.) This conclusion is further supported by A.A.'s cautious responses during additional questioning: "I *think* I can follow [instructions]," "I *think* I could [vote for the death penalty]," "I *will try*, you know, to be fair," "*probably* I could [sign a death penalty verdict form]."

Defendant acknowledges that deference to a trial court's determinations is owed when a prospective juror's responses are

conflicting or equivocal. He asserts, however, that deference is not appropriate here because A.A. did not exhibit ambivalence or confusion, but instead explicitly stated he would set aside his personal beliefs and follow the court's instructions. Defendant further asserts that A.A.'s responses indicated he distinguished between his personal views against the death penalty and his willingness to follow the court's instructions.

The record shows, however, that A.A.'s responses were conflicting and equivocal. On the one hand, he stated that he believed he could be open minded about the appropriate penalty, that he would try to be fair and follow the judge's instructions, and that he was willing to consider all of the aggravating and mitigating evidence. On the other hand, he stated that he believed the death penalty was "unbiblical," that it served no purpose, and that his moral feelings against the death penalty were so strong that he would always vote against it. Any responses suggesting A.A. would follow the court's instructions notwithstanding his opposition to the death penalty were contradicted when he indicated, several times, that he would always choose life without parole over the death penalty when given a choice between the two.

Given these conflicting statements, we defer to the trial court's determination regarding A.A.'s state of mind (see *People v. Duenas*, *supra*, 55 Cal.4th at p. 10), and conclude the record supports the trial court's ruling. The trial court was able to hear A.A.'s responses to the prosecutor's questions and observe firsthand his demeanor and tone. The trial court did not err in concluding that A.A.'s assurances that he could follow the court's instructions notwithstanding his personal beliefs were undermined by his conflicting responses, particularly his statement that, if given a choice, he would always vote for life

without the possibility of parole. Although defense counsel understood A.A. to have been speaking abstractly, the court was entitled to accept A.A.'s comment at face value particularly given, as the trial court noted, that A.A. would have a choice about whether to impose the death penalty or life without the possibility of parole. The court's assessment of A.A.'s conflicting responses and its observation of A.A.'s demeanor and tone "could give rise to a definite impression that [A.A.'s] views on the death penalty would substantially impair the performance of his duties." (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007.) We therefore conclude the trial court did not err in excusing A.A. for cause.

### b. *Prospective Juror M.M.*

Prospective Juror M.M. indicated in her questionnaire that she previously was opposed to capital punishment but that when she completed her questionnaire she believed that life in prison might be worse than death. When asked to pick a number from one to 10, with the number 10 being strongly in favor of having a death penalty and the number one being strongly opposed, M.M. circled the number five, commenting that the punishment "doesn't really matter because, if convicted, the defendant's life is over anyway." She checked "No" when asked whether she had strong feelings on the subject of the use of capital punishment. She checked "Yes" when asked whether she believed she could be open minded about the penalty decision and would consider all of the aggravating and mitigating evidence before making that decision.

M.M.'s questionnaire responses suggested some confusion regarding the meaning of special circumstance murder. Specifically, when asked how she felt regarding the death

penalty as punishment for a murder with a special circumstance, M.M. wrote that it "depend[ed] on the special circumstance, if someone can be treated or helped with their 'special circumstance' then I would not vote for the death penalty."

During voir dire, the court asked M.M. whether she could think of any reason why she could not be a fair and impartial juror in the case. M.M. responded that she believed she could be fair during the guilt phase, "but when it came to penalty, I've been thinking about it for the last week and I know that I can't put someone to death." The court probed further, asking, "So you're saying that regardless of the evidence and regardless of the weighing in aggravation and mitigation in the penalty phase, because of certain principles you hold, you could never impose the death penalty. Is that what you're saying?" M.M. replied, "That's what I'm saying, yes." The court then excused M.M. for cause on its own motion, finding that she could not be a fair and impartial juror to both sides in the penalty phase of trial.[6]

The record fairly supports the court's finding that M.M.'s views on the death penalty would impair the performance of her duties as a juror. M.M. indicated in her questionnaire that she was neutral on the subject of capital punishment. During voir dire questioning, however, she stated that her views had

---

[6] Defense counsel did not object to M.M.'s excusal. Defendant's claim is not forfeited, however, because the trial occurred before our decision in *People v. McKinnon* (2011) 52 Cal.4th 610 at page 636, holding that counsel would *prospectively* be required to make a timely objection to preserve a *Witt* issue for appeal. (See also *People v. Buenrostro* (2018) 6 Cal.5th 367, 413.)

changed and that she knew she could not vote for death. In response to the court's subsequent question, she confirmed that she could never vote for death, regardless of the evidence and the aggravating and mitigating factors. M.M.'s responses indicating she would be unable to impose death even in an appropriate case, when coupled with the court's firsthand observations of M.M.'s demeanor and tone, "could give rise to a definite impression that [M.M.'s] views on the death penalty would substantially impair the performance of [her] duties." (*People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1007.)

Defendant asserts the court's questions to M.M. did not amount to an adequate and effective inquiry. He emphasizes that the court never asked M.M. directly whether her opposition to the death penalty meant she was not willing or able to set aside her views and to follow the court's instructions to determine the appropriate punishment. And he asserts that additional questioning was especially important because it was apparent from M.M.'s responses to the juror questionnaire that she did not understand the meaning of aggravating and mitigating factors.

Before excusing a juror for cause, " 'the court must have sufficient information regarding the prospective juror's state of mind to permit a reliable determination' " concerning whether the juror's views on capital punishment would impair his or her performance as a juror in a capital case. (*People v. Leon* (2015) 61 Cal.4th 569, 592, italics omitted (*Leon*), quoting *People v. Stewart, supra,* 33 Cal.4th at p. 445.) To ensure that its ruling excusing a prospective juror for cause is consistent with the constitutional standard, the court must make " 'a conscientious attempt to determine a prospective juror's views . . . .' " (*Leon,*

*supra*, 61 Cal.4th at p. 592, quoting *People v. Wilson*, *supra*, 44 Cal.4th at p. 779.)

In *Leon*, three prospective jurors stated in their juror questionnaires that they were opposed to the death penalty but could nonetheless set aside their personal feelings and follow the law. (*Leon*, *supra*, 61 Cal.4th at pp. 590–591.) During voir dire, the trial court asked those jurors questions related only to whether they were so opposed to the death penalty that they would automatically vote for life without the possibility of parole, but not whether they could set aside their personal feelings. (*Id.* at p. 591.) The court then excused those jurors for cause. (*Ibid.*) We held the court's approach was problematic because when confronted with the jurors' conflicting statements, "the court did not inquire about the jurors' willingness to set aside their views and follow the law . . . ." (*Id.* at p. 593.)

The present case is distinguishable from *Leon* given M.M.'s clear and unambiguous statements during voir dire regarding her inability to impose the death penalty. Unlike the prospective jurors in *Leon*, who stated affirmatively that they could set aside their personal views, M.M. firmly and directly stated that her views on the death penalty had changed between when she completed the juror questionnaire (when she stated she was neutral on the subject of capital punishment) and when she was questioned on voir dire (when she stated that she could never put someone to death). The court presumably assessed those answers in light of M.M.'s tone and demeanor. Although M.M. indicated on her questionnaire that she did not have strong views regarding the death penalty and that she could follow the court's instructions, her statements during voir dire effectively repudiated her questionnaire responses. And her statements during voir dire were unequivocal and

38

unambiguous. She stated, "I know that I can't put someone to death." The court immediately summarized and clarified her beliefs: "So you're saying that regardless of the evidence and regardless of the weighing in aggravation and mitigation in the penalty phase, because of certain principles you hold, you could never impose the death penalty. Is that what you're saying?" And M.M. replied, "That's what I'm saying, yes."

These responses were clear and unambiguous statements from which the trial court could properly conclude that M.M. would not be able to set aside her beliefs and follow the court's instructions. (See *People v. Perez* (2018) 4 Cal.5th 421, 446 [upholding removal of juror during trial, finding juror's statement that, upon reflection, he " 'could not ever' " impose death penalty " 'no matter what the aggravating circumstance is and no matter what the mitigating circumstance evidence is,' " was a "clear indication that he would not be able to perform his duty of choosing whether a death sentence was appropriate"]; *People v. Winbush* (2017) 2 Cal.5th 402, 429–430 [upholding removal of prospective juror when oral questioning revealed the prospective juror's views would substantially impair her ability to return a death sentence, despite juror's questionnaire responses expressing a willingness to consider the death penalty].) Defense counsel's failure to object to M.M.'s removal did not forfeit the claim on appeal, as we have noted, but it does suggest that counsel " 'concurred in the assessment that the juror was excusable.' " (*People v. Souza* (2012) 54 Cal.4th 90, 127, quoting *People v. Cleveland* (2004) 32 Cal.4th 704, 735.)

Defendant further asserts that additional inquiry was required by the trial court because it was apparent from M.M.'s responses to the juror questionnaire that she did not understand

the meaning of aggravating and mitigating factors. We disagree. Although M.M.'s questionnaire response suggested she did not understand what was meant by a murder "with a special circumstance" when she completed the questionnaire, it does not shed light on her understanding of aggravating and mitigating factors at the time she told the court that regardless of such factors she could never impose the death penalty. As this court has observed, "When first called to the capital venire, prospective jurors frequently know little about death penalty law and procedure and have reflected little on their own attitudes." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1053.) We have also recognized, however, that the voir dire process, when conducted in the presence of the entire venire, can serve to educate a prospective juror and help clear up misunderstandings regarding his or her duty as a juror in a death penalty case. (*Ibid.*)

Contrary to defendant's assertion, nothing in the record suggests that M.M., after having listened to the voir dire questioning of the other prospective jurors, would have misunderstood the meaning of aggravating and mitigating factors. When examining prospective jurors before M.M. was called into the jury box on the second full day of jury selection, the prosecutor and defense counsel repeatedly explained what was meant by aggravating and mitigating factors and the process by which those factors were weighed during the penalty determination. There is no indication, then, that M.M.'s clear statement that she could not impose the death penalty was the result of confusion or misunderstanding. To the contrary, the record supports the trial court's determination that M.M.'s views regarding the death penalty would impair her ability to perform her duty as a juror in the case.

## III. GUILT PHASE ISSUES

### A. Admission of Recording of Answering Machine Message from Burger

Defendant argues that the trial court erred prejudicially when it admitted the recording of a message that Burger left on the telephone answering machine of her dance class partner on the evening before Burger's death. Although the relevance of the message was not particularly strong and the evidence arguably posed some risk of undue prejudice, any error in its admission is harmless in light of the overwhelming evidence of defendant's guilt.

#### 1. Background

In a trial brief submitted prior to jury selection, the prosecution asked the court to permit admission of a recording of a message that Burger had left for her dance class partner, Larry Rodriguez. In the message, left the evening before her death, Burger discussed plans for attending dance class the next day. The message, which is less than 30 seconds long, was as follows: "Hi Larry. This is Cindy. And it's about 9:15 on Wednesday night. Give me a call back if you can, uh, or at work tomorrow. I'd like to meet a little early before class and go over the step from last week. Um, I just hope I don't get too lost tomorrow. But anyway, I had a real good, uh, trip. Look forward to seein' ya, and give me a call when you get a chance. Bye-bye."

The prosecutor argued that Burger's message was admissible for the nonhearsay purpose of showing that she planned to stay at home that night rather than to go out. Such evidence, he argued, precluded any inference that Burger met defendant while she was out and invited him back to her home. The prosecutor also argued that the message would corroborate

Mooney's anticipated testimony that defendant told her he entered Burger's open garage intending to steal something.

In a written response to the prosecutor's trial brief, the defense opposed admission of the recording on the grounds that it was not relevant to any disputed issue, that the evidence did not satisfy the "state of mind" exception to the hearsay rule and was therefore inadmissible hearsay, and that the "voice from the grave" evidence was more prejudicial than probative. Counsel also argued that the recording amounted to improper victim impact evidence because there was little doubt that Rodriguez would become emotional while testifying regarding the tape's authenticity.

At a hearing on the in limine motion, defense counsel again asserted the message was not relevant because whether Burger had stayed home was not an issue in dispute. The prosecutor asserted that the prosecution had the burden of proving defendant's intent on entering the house, no matter what the defense intended to dispute. According to the prosecutor, the prosecution had "to show that this isn't some pickup or date that went awry" and was therefore entitled to show Burger was planning to be home the evening she was killed. The trial court agreed with the prosecutor that the message was admissible for both a hearsay and a nonhearsay purpose, and found that the probative value of the evidence outweighed its prejudicial impact.

The message was played for the jury three times. First, during the prosecution's opening statement at the guilt phase. Second, during the testimony of Rodriguez (the prosecution's first witness in the guilt phase). And, finally, during the prosecution's closing at the penalty phase. Defendant now

asserts the admission of the message during the guilt phase (but not during the penalty phase) was prejudicial error.

### 2. *Discussion*

Defendant argues that the answering machine message was not relevant, constituted inadmissible hearsay, created an "aura of sympathy and pathos" that harmed defendant's case, and should have been excluded as unduly prejudicial. We conclude that, even assuming the trial court erred by refusing to exclude or limit the recording, any error was undoubtedly harmless under the standard articulated in either *Chapman v. California* (1967) 386 U.S. 18, 36 (*Chapman*) (error is prejudicial unless it appears beyond a reasonable doubt that the error did not contribute to the verdict) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) (error is prejudicial if it is reasonably probable the defendant would have obtained a more favorable result absent the error).

There was overwhelming evidence of defendant's guilt. Defendant admitted to Mooney that he raped and killed Burger, and he asked for Mooney's help escaping from custody to avoid detection. Mooney provided compelling testimony describing defendant's detailed account of the crime. She described defendant's statements about gaining entry into Burger's home through an open garage, raping Burger in her bed, strangling her to death, placing her body in a bathtub, pouring bleach into the bathtub, and starting a fire in her bedroom. These are details Mooney could not have known about the crime absent defendant's statements to her. He gave Mooney Burger's name and directed her to a newspaper article by providing the date of the incident. This testimony was consistent with the crime scene and the assault on Burger.

Loprieato, defendant's mother, confirmed that Mooney had told her about the confession and said she had no reason to doubt what Mooney had related to her. Although Loprieato maintained that defendant never confessed to her personally, her surreptitiously recorded statements to Mooney stating she would lie to law enforcement about her knowledge would have drawn her credibility on that point into doubt. And Loprieato's testimony on that point was further undermined by Bice, who told the jury that Loprieato spoke with him about whether to be candid with law enforcement. According to Bice, Loprieato admitted that defendant told Loprieato directly that he had killed a woman.

Finally, DNA from sperm collected during Burger's autopsy matched a DNA profile developed from defendant's blood.[7] The DNA evidence directly linked defendant to Burger's death. All of this evidence taken together establishes beyond a reasonable doubt that the jury would have reached the same verdict absent any error regarding Burger's message to Rodriguez.

Defendant's main assertion regarding prejudice is that the message tainted the jury's determination regarding premeditation. He contends the message "led the [jurors] to feel that they knew Burger" and "made it difficult for them to focus dispassionately on the elements of murder and accept the defense that Schultz's perceptions were so altered by

---

[7] As discussed below, although certain testimony regarding the DNA evidence may have been improperly admitted, the ultimate determination that the DNA profile developed from defendant's blood matched the DNA from sperm found during Burger's autopsy was properly admitted.

methamphetamine that it was impossible for him to premeditate this crime or that the crime was not premeditated but simply a random, albeit terrible, act." There is no support for defendant's position. Defendant's statements to Mooney — that he killed Burger because he was afraid she would be able to identify him and that he attempted to destroy any DNA evidence by lighting a fire on her bed and placing Burger's body in a bathtub with bleach — amply support a finding of premeditation. Further, the jury found true the felony-murder special-circumstance allegations that defendant murdered Burger during the commission of a rape and burglary. Defendant could be convicted of first degree murder regardless of the jury's determination regarding premeditation. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 848.) As defense counsel put it during closing argument, "in a lot of ways [premeditation] doesn't really matter because what happened is a felony murder any way you slice it." Although the jury was exposed to a "voice from the grave," any error in the court's admission of the message did not prejudice defendant.

## B. Admission of the Results of DNA Testing

Defendant challenges the admission of expert testimony establishing that defendant's DNA profile matched the DNA profile obtained from sperm recovered during Burger's autopsy. He puts forward three reasons the testimony should have been excluded: first, that Magee related testimonial hearsay in violation of defendant's Sixth Amendment rights because Yates did not testify; second, that it was not admissible as a business record under Evidence Code section 1271; and third, that the trial court erred by failing to adequately evaluate the proposed testimony under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*). We

conclude that any error in admitting this testimony was harmless beyond a reasonable doubt.

### 1. Background

Prior to trial, the prosecution sought a ruling allowing a supervisor at Cellmark to testify regarding the procedures, results, and maintenance of the DNA testing records relevant to the case. At a hearing, the court initially denied the motion, agreeing with defense counsel that to properly present the DNA evidence the prosecution was required to call the technicians who performed the DNA testing to testify regarding the actual procedures they employed. On the prosecution's motion for reconsideration, however, the court reversed its previous ruling and, over defense counsel's objection, permitted the prosecution to call Wendy Magee, the Cellmark analyst who performed a DNA comparison in 2000 (comparing DNA profiles she created based on samples from defendant's blood and from sperm found in Burger's vagina) but who did not perform the DNA extraction in 1996 (extracting DNA from sperm found in Burger's vagina).

At trial, the jury heard the following testimony. Dr. O'Halloran conducted Burger's autopsy, discovered trauma to her genital area, swabbed and aspirated her vaginal canal, and observed sperm cells during a microscopic examination from one of the swabs. Ventura County Sheriff's Department crime lab assistant laboratory manager Michael Parigian testified that the lab received the vaginal swabs and vaginal aspirant (which he referred to as a "vaginal wash"). Several years later, in March 1996, Parigian placed some of the vaginal wash into a microcentrifugued tube and sent it to Cellmark for the purpose of extracting DNA. Parigian also testified that Cellmark

returned the vaginal wash to the crime lab with a report indicating that DNA had been extracted.

Over a continuing defense objection, the prosecution called Magee to testify. Magee testified that in 1996 Cellmark employee Paula Yates performed a differential extraction to isolate DNA from the sperm and nonsperm portions of the vaginal wash. That procedure involved separating the nonsperm cells from the sperm cells and extracting DNA from both to be used for future testing. According to Magee, Yates was trained and qualified to carry out a DNA extraction and the methods she used were accepted within the scientific community at the time of testing and at the time of trial.

Magee further explained that Yates recorded her lab notes regarding the extraction procedure, and that any later evidence could be compared with the DNA obtained during the extraction that Yates had performed. Magee confirmed that at the time of the DNA extraction in 1996 Cellmark had no blood or tissue sample from defendant with which to conduct a DNA comparison.

In November 2000, a blood sample was obtained from defendant and sent to Cellmark. Magee explained to the jury that she performed a DNA analysis of the blood sample. She compared that analysis to the DNA profiles she obtained from testing the sperm and nonsperm portions of the vaginal wash. Her testing, using short tandem repeat (STR) amplification kits, showed that the DNA profile she obtained from the nonsperm cells did not match the DNA profile obtained from defendant's blood sample. The DNA profile she obtained from the sperm cells, however, did match the DNA profile obtained from defendant's blood sample.

### 2. Discussion

Defendant asserts multiple errors occurred based on Magee's purported testimony that she compared the DNA profile *she* created from defendant's blood sample with a DNA profile *Yates* created from sperm cells recovered during Burger's autopsy in 1996. The factual premise of these claims is that Magee's conclusions relied on a DNA profile that Yates had created, and thus necessarily communicated Yates's findings to the jury. Specifically, defendant asserts that Magee's testimony regarding the DNA profile Yates created and the "process involved to secure" that DNA profile constituted testimonial hearsay admitted in violation of defendant's confrontation clause rights under *Williams v. Illinois* (2012) 567 U.S. 50. Defendant further asserts the trial court abused its discretion in allowing Magee's testimony under the business records exception to the Evidence Code because Yates used her personal conclusions to develop the DNA profile and because Yates's records were created for use as evidence in a criminal trial. Finally, defendant asserts the trial court was required to conduct a *Kelly* hearing to test the reliability of the DNA profile Yates created and the methods Yates used to develop that profile.

The record belies the factual basis for defendant's claims. It is apparent from the record that Magee did not rely on any DNA profile created by Yates. Rather, Magee's testimony indicates that Magee herself created a DNA profile using DNA extracted from sperm cells, that Magee herself created a DNA profile based on defendant's blood sample, and that Magee herself compared the two DNA profiles. Thus, to the extent

48

defendant's claims hinge on the premise that Magee relied on a DNA profile that Yates created, they necessarily fail.[8]

To be sure, some portions of the record suggest that Yates may have created a DNA profile in 1996. At one point during her testimony, Magee agreed with the prosecution's characterization that Yates both performed a DNA extraction and created a DNA profile from the extracted DNA.[9] And in describing the proffered testimony before trial, the prosecution stated that Cellmark had produced a DNA profile in 1996 based on the vaginal wash. But other portions of the record make clear that, even assuming Yates created a DNA profile, Magee relied on — and confined her testimony to — DNA profiles that she created herself. Magee's testimony describing Yates's actions

_____

[8] For this reason, the facts here are readily distinguishable from *Williams*. There, a nontestifying expert created a DNA profile based on semen found on vaginal swabs, and a testifying expert relied on this DNA profile to conclude that it matched the defendant's DNA profile. (*Williams*, *supra*, 567 U.S. at p. 60 (plur. opn.).) In this case, as we have observed, Magee created both the DNA profile from the sperm and the DNA profile from defendant's blood, she compared the two profiles herself, and she testified at trial regarding her actions and her conclusion that the DNA profiles matched. Magee did not rely on any DNA profile created by a nontestifying expert. We therefore need not delve further into the fractured opinion in *Williams* or the "considerable flux" surrounding the high court's Sixth Amendment jurisprudence in this area. (*People v. Bryant, Smith, and Wheeler* (2014) 60 Cal.4th 335, 395 (*Bryant*); see also *People v. Dungo* (2012) 55 Cal.4th 608, 628 (conc. opn. of Chin, J.).)

[9] That testimony was as follows: "[The People]: And do your records show that the vaginal wash pellet was separated into a sperm and nonsperm fraction or portion and DNA was extracted from each and a DNA profile was obtained for each? [¶] [Magee]: Yes."

related only to DNA extraction, not to profile creation. And Magee testified that she "tested the extracts from 1996" to compare with the DNA profile from defendant's blood sample. There is no indication, then, that Magee compared a DNA profile she created with a DNA profile Yates created.

Defendant also broadly asserts that evidence of the DNA *extraction* Yates conducted could be admitted only through testimony from Yates herself, rather than through testimony from Magee. At oral argument before this court, counsel further asserted that Magee was not qualified to testify regarding the DNA extraction carried out by Yates because there was no ability for defendant to cross-examine Magee regarding the DNA extraction in any meaningful way. And without Yates's DNA extraction, defendant asserts, Magee's testimony regarding her creation and comparison of the DNA profiles could not be admitted.

Even assuming the trial court erred under the Sixth Amendment, Evidence Code section 1271, or *Kelly* by admitting Magee's testimony describing the DNA extraction performed by Yates any error was harmless beyond a reasonable doubt. (See *Bryant*, *supra*, 60 Cal.4th at p. 395 [confrontation clause violations are subject to federal harmless error analysis under *Chapman*]; *People v. Ayers* (2005) 125 Cal.App.4th 988, 996 [applying *Watson* standard to evaluate prejudice when evidence is improperly admitted as a business record under Evid. Code, § 1271]; *People v. Venegas* (1998) 18 Cal.4th 47, 93 [applying the *Watson* standard for evaluating prejudice when evidence is improperly admitted under *Kelly*].)

To determine prejudice, we examine the record as though Magee's testimony regarding the actions carried out by Yates

had not been admitted. But this analysis does not require us to set aside Magee's testimony in its entirety. As counsel acknowledged at oral argument, Magee was qualified to testify about the procedures she conducted herself, including the creation of the DNA profiles. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 872 [holding any error in allowing a testifying analyst to describe results obtained by a nontestifying analyst was harmless beyond a reasonable doubt in part because the testifying analyst "personally" performed the STR test implicating the defendant].)

Nor does setting aside the portion of Magee's testimony related to the DNA extraction fatally undermine the chain of custody or foundation supporting Magee's testimony regarding the DNA profiles. The jury heard testimony from Dr. O'Halloran that he recovered sperm cells after swabbing and aspirating Burger's vaginal canal. The swabs and aspirant were sent to the county crime lab, and Parigian then sent the vaginal wash sample to Cellmark. Parigian also testified that he received the evidence back from Cellmark with a report indicating that DNA had been extracted from the sample.[10] Parigian further testified that in 2000 he again sent Cellmark the vaginal wash sample along with a blood sample collected from defendant. Magee related to the jury that she created a DNA profile from defendant's blood sample, that she "tested the extracts from 1996," and compared the resulting profiles herself. This narrative sufficiently established that Magee created a DNA profile based on sperm recovered from Burger's autopsy, and supported Magee's ultimate conclusion that the DNA profile

---

[10]  Defendant does not challenge the admission of Parigian's testimony describing the Cellmark report.

from defendant's blood sample matched the DNA profile from that sperm.

There is no indication that the chain of custody here was compromised. The trial court stated it was "not particularly worried about" any chain of custody related to the DNA evidence, and defendant does not raise any claim of a chain of custody error. The evidence connecting the DNA evidence recovered from Burger's autopsy to the DNA profile Magee created "raise[s] no serious questions of tampering." (See *People v. Caitlin* (2001) 26 Cal.4th 81, 134.) In any event, any presumed defect in the chain of custody would not have rendered Magee's testimony entirely inadmissible but would have gone to the weight of her testimony. (See *People v. Lucas* (2014) 60 Cal.4th 153, 285 ["the trial court decides the admissibility of physical evidence based on challenges to the chain of custody, and, once admitted, any minor defects in the chain of custody go to its weight"].)

We find that any error in admitting Magee's testimony regarding the actions Yates took is harmless beyond a reasonable doubt. As we discussed above, there was overwhelming evidence of defendant's guilt presented during trial. Magee's conclusion that defendant's DNA matched the DNA from sperm found during Burger's autopsy provided strong support for the prosecution's case. The presence of defendant's sperm also corroborated defendant's asserted motive for killing Burger (to prevent her from identifying him as her rapist). Even without being able to point to the DNA extraction process, Magee's testimony established for the jury that DNA recovered from sperm found in Burger's body matched defendant's DNA profile.

The DNA evidence was buttressed, too, by testimony from Mooney, Loprieato, and Bice. Mooney provided compelling testimony describing defendant's detailed confession, and her testimony was consistent with the crime scene and the assault on Burger. Mooney's testimony was corroborated by Loprieato, and further supported by testimony from Bice. All of this evidence taken together establishes beyond a reasonable doubt that the jury would have reached the same verdict absent Magee's testimony describing the DNA extraction process conducted by Yates.

Defendant maintains that the trial court's decision to allow Magee to testify as she did "forced defense counsel to abandon an entire line of defense and to make concessions during the guilt phase that would not have been made had he had the opportunity to attack Yates's DNA profile." He asserts that counsel would not have conceded defendant's guilt and would have attacked Mooney's credibility regarding defendant's alleged confession because it was "easily impeached." He alleges that Mooney had previously and unsuccessfully tried to implicate defendant in the death of a different woman, Jennifer Vernals, and that Mooney's credibility would have been seriously undermined had the jury known she made more than one accusation that defendant had killed a woman. He also attacks Mooney's account of defendant's confession as being based on her "weird feelings," and he asserts that the details of the crime came from the newspaper article Mooney read and not from any confession from defendant.

We are not persuaded. To the extent that defendant's prejudice arguments are premised on the notion that Magee relied on a DNA profile Yates created, we have already rejected them. To the extent defendant's assertions are based on

prejudice stemming from the introduction of Yates's actions by way of Magee's testimony, they likewise fail.

Defendant focuses in part on how counsel allegedly would have revealed serious flaws in Yates's report if she had testified. But he provides no support for this assertion and we have found none in the record. Defendant's attacks on Mooney's credibility are also unpersuasive. Mooney's suspicion that defendant was involved in Vernals's death was raised during the preliminary hearing. Mooney testified at the preliminary hearing that when she first told Loprieato about defendant's plan to escape from the fire camp because of his concerns about a DNA test, Loprieato produced a clipping of a newspaper article discussing Vernals's death and said, "This is what I think he did." Although it's not clear from the record what was in the newspaper article, Mooney testified that she (Mooney) was named in the article (although defendant was not) and that the article, "kind of said that I might have [implicated defendant] on that Jennifer Vernals case. And I think [Loprieato] was going to confront me with him about that."

Mooney also testified at the preliminary hearing that during the visit when defendant asked her and Loprieato for help escaping, she and Loprieato confronted defendant about his story that he had participated in a burglary and was cut with a knife. Neither believed the story because "we both thought that he had committed the Jennifer Vernals murder." Mooney stated that during the same visit when Loprieato went to the bathroom and left Mooney alone with defendant, Mooney asked defendant whether he killed Vernals. He said he did not. Mooney then asked defendant if he had killed someone, and he said yes and went on to tell Mooney about assaulting and killing Burger.

Bringing this issue to the attention of the jury would not have undermined Mooney's credibility, as defendant suggests. On the contrary, it would likely have been highly prejudicial to defendant for defense counsel to alert the jury that defendant's girlfriend (and perhaps also his mother) believed he had killed another woman besides Burger. Indeed, defense counsel filed a motion in limine to exclude any references to Vernals's death at trial. The prosecution did not object, and the court granted the motion and directed the prosecution to instruct the witnesses not to mention Vernals during trial.

Nor is there any indication in the record that the details of the crime that Mooney claimed defendant had described came from Mooney herself or the newspaper article describing Burger's death.[11] Further, the testimony from Loprieato and Bice supported Mooney's credibility, and the jury was able to make its own determination as to each witness's credibility based on his or her testimony and demeanor. In short, we conclude that any error in the portion of Magee's testimony relating the DNA extraction process conducted by Yates was harmless beyond a reasonable doubt.

## IV. Penalty Phase Issues

### A. Defendant's Correspondence with a White Supremacist Gang Leader

Defendant raises two related claims concerning penalty phase rebuttal evidence informing the jury that while awaiting trial in the present matter defendant exchanged letters with Justin Merriman, a prison inmate who had once been the leader

---

[11] The newspaper article is not in the record before us.

of a white supremacist gang.[12]   First, he asserts that the rebuttal evidence violated due process as evidence of "guilt by association," infringed his constitutional right to freedom of association, was improper hearsay, and was irrelevant and unduly prejudicial.   Second, defendant argues that the trial court erred by not granting a mistrial after, contrary to the court's earlier ruling limiting the scope of the testimony regarding the letters, the prosecutor inquired into the contents of one of the letters.  As we explain below, neither claim requires reversal of the death judgment.

### 1. Admission of evidence regarding the correspondence

#### a. Background

##### i. Prosecution's cross-examination of Casas

As part of its penalty phase case in mitigation, the defense called penology expert Anthony Casas, who expressed the view that defendant would conduct himself in an obedient and cooperative manner if sentenced to life in prison without the possibility of parole.  (See *ante*, pt. I.B.2.iii.)   On cross-examination, the prosecutor elicited from Casas that Casas would predict a negative adjustment to prison for someone who had joined a prison gang such as a white supremacist gang. Casas explained that such gangs are dangerous "because when you have a situation like that, if the individual is a validated member of one of those gangs and gets an order to do something, like kill an officer or kill an inmate, and he doesn't do it, then he's signed his own death warrant because the punishment for

---

[12]   We upheld Merriman's first degree murder conviction on direct appeal in 2014.  (*People v. Merriman* (2014) 60 Cal.4th 1.)

failing to carry out a contract with these organizations, the organized prison gangs, is death usually."

The prosecutor then showed Casas photographs of defendant's tattoos that said "white" and "pride," and asked whether this indicated that defendant might join a white supremacist gang. Casas replied, "Not at all." The prosecutor asked whether Casas's answer would change if he knew defendant had been corresponding with a former leader of a Ventura County-based white supremacist gang called the Skinhead Dogs. Defense counsel promptly objected on the ground of undue prejudice and lack of foundation, pointing out at a sidebar conference that there was no evidence defendant was in a gang. The court sustained the objection for lack of foundation. But the court allowed the prosecutor to attempt to lay a foundation by probing Casas's experience regarding the topic of prison gang membership.

When questioning resumed, the prosecutor elicited from Casas that a person who holds white supremacist beliefs might be likely to join a white supremacist gang. But Casas strongly disagreed with the prosecutor's suggestion that a person with "white pride" tattoos would be more likely to join a white supremacist gang than a person without such tattoos. Nor did Casas believe that any correspondence between defendant and a one-time gang leader in which defendant referred to the gang leader as "homey" and signed his letter "with respect" meant that defendant was more likely to join a gang than someone not engaged in such correspondence. Casas reiterated that an exchange of letters in which an individual referred to the recipient white supremacist gang member as "homey" or "brother" would not be enough to conclude that the letter writer

was more likely to join a gang. As Casas phrased it, "it could or it couldn't."

### ii. Prosecution's rebuttal

One of the prosecution's rebuttal witnesses was District Attorney Investigator Dennis Fitzgerald. Anticipating that the prosecution would seek to introduce the correspondence between defendant and Merriman through Fitzgerald's testimony, the defense sought an offer of proof outside the jury's presence. In relevant part, the prosecutor indicated that Fitzgerald would testify based on defendant's booking record that defendant likely obtained his "white pride" tattoos in prison. Fitzgerald, who was the investigator in Merriman's capital case, would also testify that he had reviewed the two letters Merriman wrote to defendant and the one letter defendant wrote back to Merriman. Fitzgerald would testify that defendant and Merriman addressed each other as "homey" and "brother" and that defendant asked Merriman to "stay in touch." Fitzgerald would also inform the jury that Merriman was a member of a skinhead gang that advances the doctrine of white supremacy. After having laid that foundation, the prosecutor explained, he intended to introduce the letters.

Defense counsel objected to the admission of the three letters on the grounds that they constituted inadmissible hearsay, were irrelevant to the argument that defendant was likely to join a prison gang, were highly prejudicial, and would violate defendant's right to a fair trial if introduced. As counsel pointed out, the letters disparaged counsel and the court system by, for example, referring to "kangaroo courts" and unfair juries. Notably, counsel observed, nothing in the letters referred to gangs.

The court ruled that the contents of the letters were not admissible but that the fact of the correspondence was proper rebuttal to the defense expert's opinion that defendant would adapt well to life in prison. The court also indicated it would allow the prosecutor to elicit from Fitzgerald how defendant and Merriman addressed each other, how they signed their letters, and whether Merriman was a gang member. Defense counsel renewed his objection to this limited line of questioning, but indicated he understood the court's ruling.

Fitzgerald then testified in front of the jury that he had reviewed defendant's booking records and concluded that he had received his "white pride" tattoo sometime while in custody after 1996. Fitzgerald also testified that he was the lead investigator in a criminal case involving Merriman, who was then a leader of a white supremacist gang in Ventura County called the Skinhead Dogs. Fitzgerald indicated that he was familiar with Merriman's writings and that he had reviewed an exchange of letters between defendant and Merriman. He testified that in the letter from defendant to Merriman, defendant twice referred to Merriman as "homey" and signed off with the phrase "Long respects, Michael J. Schultz." In one of the two letters Merriman wrote to defendant, Merriman referred to defendant as "brother" and signed it "with respect, Justin James Merriman." The salutation in a second letter from Merriman to defendant referred to defendant as "Big Mike" and later as "brother" and "homey," and again ended with the phrase "With respect."

Fitzgerald did not state any opinion regarding defendant's ability to adjust to life in prison. On cross-examination, defense counsel elicited from Fitzgerald that he was aware of no

evidence showing that defendant was ever a member of the Skinhead Dogs.

### *iii. Jury instructions and closing argument*

The jury was instructed by the trial court that it could not consider the letters and salutations as factors in aggravation: "Evidence received in the penalty phase of this trial regarding Mr. Schultz's correspondence with another inmate and his tattoos may not be considered as a factor or factors in aggravation."

Toward the end of the prosecution's closing argument at the penalty phase, the prosecutor discussed the defense evidence regarding defendant's prospects for a positive adjustment to life in prison. In the prosecutor's view, evidence of defendant's positive behavior while previously in custody was not a significant mitigating factor even if true. He nonetheless argued to the jury that Casas's testimony should not be credited. In the course of that brief argument, the prosecutor pointed out that Casas's opinion was based in part on his belief that defendant would not join a prison gang. Casas's opinion was refuted, the prosecutor argued, by evidence that defendant received a "white pride" tattoo in prison and that he was in contact with a member of a white supremacist gang. The prosecutor clarified that he was not suggesting the evidence of defendant's correspondence with Merriman was a factor in aggravation, or that Merriman endorsed Burger's rape and murder. Rather, he asserted, the use of the terms "homey" and "brother" indicated a possibility that defendant would be interested in joining the gang, thereby undermining the defense argument that defendant would adapt well to life in prison.

### b. Discussion

### i. Asserted First Amendment violation

Defendant argues that, assuming the rebuttal evidence established that he shared Merriman's white supremacist views and wanted to associate with Merriman and his gang, the admission of such evidence infringed his First Amendment rights to freedom of association and belief.

As defendant acknowledges, he did not raise this First Amendment claim in the trial court, but objected only on relevance and prejudice grounds. Citing *People v. Partida* (2005) 37 Cal.4th, 433–439 and *People v. Boyer* (2006) 38 Cal.4th 412, 441, defendant asserts that he has not forfeited the claim notwithstanding the lack of a specific objection because the arguments he now presents do not invoke facts or legal standards different from those the trial court was asked to apply. Neither case is availing because the legal standards applicable to a claim under Evidence Code section 352 and a First Amendment claim are different. Under Evidence Code section 352, a court determines whether evidence (including evidence of a defendant's racist beliefs) is relevant and its probative value is not substantially outweighed by the probability of prejudice, undue consumption of time, confusing the issues, or misleading the jury. (See *People v. Young* (2019) 7 Cal.5th 905, 930–931 (*Young*).) A First Amendment claim, on the other hand, asks a court to exclude evidence not only because it is irrelevant, but because it is irrelevant and therefore its only possible purpose is to invite the jury to convict the defendant based on protected speech or associational activity. (See *id.* at p. 946.)

In *Young*, this court held that a First Amendment claim nearly identical to the one raised here was forfeited when that defendant objected during the guilt phase of a capital trial to the admission of his racist tattoos and beliefs only on relevance and prejudice grounds. (*Young, supra*, 7 Cal.5th at pp. 931–932.) Here, too, the claim is forfeited. Defendant's general objections on relevance and prejudice grounds did not preserve the more specific First Amendment claim he now attempts to raise.

### ii. Asserted due process claim

Defendant asserts that the testimony regarding the fact of the correspondence between himself and Merriman and the salutations in their letters was improper rebuttal evidence because it was based on a "guilt by association" theory and thus violated due process. To the extent this claim amounts to an assertion that the evidence was irrelevant or unduly prejudicial, we reject it below. To the extent the claim is related to defendant's First Amendment claim or raises a separate "guilt by association" due process claim, it was not raised in the trial court and is therefore forfeited. (See *Young, supra*, 7 Cal.5th at pp. 931–932; *People v. Fuiava* (2012) 53 Cal.4th 622, 689.)

### iii. Evidence Code section 352

Defendant argues that the evidence regarding his correspondence with Merriman was more prejudicial than probative and should have been excluded under Evidence Code section 352. We examine the trial court's decision to determine whether the court " 'exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, quoting *People v. Jordan* (1986) 42 Cal.3d 308, 316.) We are not persuaded the trial court erred.

The probative value of the evidence here related to the defense expert's opinion that defendant would adjust well to life in prison. In light of this testimony, the prosecution was entitled to explore the issue on cross-examination and rebuttal. (See *People v. Gates* (1987) 43 Cal.3d 1168, 1211, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 458–459; see also *People v. Mattson* (1990) 50 Cal.3d 826, 878 ["Evidence of future dangerousness may be introduced in rebuttal when the defendant himself has raised the issue of performance in prison and offered evidence that in a prison environment he would be law-abiding"]; *People v. Coleman* (1989) 48 Cal.3d 112, 150 [same].) In exploring the issue during cross-examination, the prosecutor could properly ask the witness whether his opinion would change if he was aware that defendant was likely to join a white supremacist gang, and to suggest several grounds from which such a possibility could be inferred. (See *People v. Winbush*, *supra*, 2 Cal.5th at p. 479 ["Having chosen to raise this subject, the defense could not reasonably insulate it from cross-examination"].) During rebuttal, the prosecutor was likewise permitted to undermine the defense expert's opinion by presenting evidence suggesting a likelihood of future gang membership. This evidence was presented through the prosecution investigator's testimony regarding defendant's "white pride" tattoos, the fact of defendant's correspondence with an incarcerated white supremacist gang leader, and the friendly salutations in defendant's letter to Merriman.

Contrary to defendant's assertion, the probative value of this evidence was not based on an inference of "guilt by association" or on defendant's alleged racist views. Rather, the evidence provided a foundation for questioning the defense

expert's opinion that defendant was likely to live out his days as a peaceful and cooperative prison inmate. For the same reason, there is no merit to defendant's assertion that the trial court should have excluded all evidence regarding the correspondence because the court knew the letters did not mention gangs or racist ideology. The trial court concluded the contents of the letters were not admissible, but the fact of the correspondence itself and some of the familiar salutations arguably indicated defendant might join a white supremacist gang. The trial court provided a limiting instruction to the jury on this point, stating that evidence "regarding Mr. Schultz's correspondence with another inmate and his tattoos may not be considered as a factor or factors in aggravation." The prosecution, in closing argument, similarly pointed out that the letters were not to be considered as factors in aggravation, but to "refute the contention that [defendant is] not so bad when he's in prison . . . ."

The defense expert disagreed with many of the prosecutor's assertions regarding the evidence during cross-examination. But the fact defendant and a former leader of a white supremacist gang had exchanged letters in which defendant referred to the former gang leader as "homey" created an inference that undermined the expert testimony that defendant would make a positive adjustment to life in prison.

The trial court did not err in concluding that the probative value of the evidence was not substantially outweighed by its potential for prejudice. As defendant acknowledges, the "prejudice" referred to in Evidence Code section 352 means " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not

synonymous with "damaging" ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, quoting *People v. Yu* (1983) 143 Cal.App.3d 358, 377; accord, *Bryant, supra*, 60 Cal.4th at p. 408.) This court has observed that gang evidence "may have a highly inflammatory impact on the jury," and that trial courts should "carefully scrutinize such evidence before admitting it." (*People v. Williams* (1997) 16 Cal.4th 153, 193, citing *People v. Champion* (1995) 9 Cal.4th 879, 922–923.) The trial court here did scrutinize the evidence, limiting its admission to the fact of the correspondence and some of the words used by defendant and Merriman, excluding a second witness the prosecutor sought to call, and providing a limiting instruction to the jury that prohibited the use of the evidence as an aggravating factor. And the limited evidence offered was not likely to evoke an inflammatory emotional bias from the jurors. The testimony was brief and limited in scope. The prosecutor's argument, likewise, did not inflame the juror's emotions; it was limited to a brief argument that defendant received a "white power" tattoo while in prison and corresponded with Merriman, which "refutes the contention that he's not so bad when he's in prison . . . ." We find no error.

### iv. Assertedly inadmissible hearsay

The trial court ruled that the contents of the correspondence between defendant and Merriman were inadmissible. However, the court did allow the prosecutor to present evidence regarding the fact of the correspondence and that defendant and Merriman referred to each other as "homey" and "brother" and signed their letters using phrases such as "with respect." Defendant argues that the court erred in admitting the salutations in the letters to him from Merriman

because they constituted inadmissible hearsay that did not fall within any exception to the hearsay rule.

As an initial matter, we disagree with the Attorney General that defendant has forfeited his hearsay challenge to this evidence by not raising it below. Defense counsel objected to the admission of the letters on various grounds, including that the letters were inadmissible hearsay. As mentioned above, the court ruled the contents of the letters were generally inadmissible with the exception of the salutations used by defendant and Merriman. Defense counsel indicated to the court that the defense still objected to the evidence but understood the court's ruling. Although the court did not articulate the basis of its ruling excluding the letters but permitting evidence of the salutations, we conclude on this record that the court was aware that counsel's hearsay objection extended to the admission of the salutations. Defendant's claim is preserved for appeal.

The Attorney General further argues that the salutations did not constitute inadmissible hearsay because they were not admitted for their truth and because they fell within the scope of the state of mind exception to the hearsay rule. (See Evid. Code, § 1250.)

As noted, the trial court did not articulate the basis of its ruling excluding the contents of the letters but allowing the salutations. Even if we assume the salutations in Merriman's letters should have been excluded, any such error would not entitle defendant to a new penalty trial because there is no reasonable possibility that the admission of the challenged evidence affected the penalty verdict. (See *People v. Wilson* (2008) 43 Cal.4th 1, 28.)

The purpose of introducing defendant's correspondence with Merriman was to rebut the defense expert's opinion that defendant would serve out his life in prison as a peaceful and cooperative inmate. As noted above, the jury was instructed that this was not to be considered as an aggravating factor. And this was a minor component of the defense case in mitigation and played an even smaller role in the prosecutor's closing argument. The focus of the prosecution's argument was instead on the callous and brutal nature of the capital crime, the strength of the evidence of guilt, and defendant's pattern of violence both before and after the murder. By contrast, the prosecutor's references to evidence of defendant's exchange of correspondence with Merriman comprised only three paragraphs in a closing argument transcript spanning 48 pages. Any assumed hearsay violation at issue amounted to a further subset of that minor component, and the salutations added relatively little to the properly admitted fact of the correspondence generally. Further, defendant does not challenge the admission of the salutations in his letters to Merriman, which were nearly identical to the salutations in Merriman's letters. On this record, there is no reasonable possibility the admission of the salutations in the letters from Merriman to defendant affected the jury's penalty verdict.

### 2. Denial of motion for mistrial

In a related claim, defendant asserts that the trial court erred in denying defense counsel's motion for a mistrial during the penalty phase. The prosecutor posed a leading question to, and elicited an answer from, rebuttal witness Fitzgerald that revealed the contents of Merriman's letter to defendant, in direct violation of the court's recent ruling. The prosecutor's question constituted misconduct. Nonetheless, we conclude that

the court did not abuse its discretion in denying the mistrial motion.

### a. Background

As observed above, immediately prior to the testimony of prosecution rebuttal witness Fitzgerald the trial court ruled inadmissible the contents of the exchange of letters between defendant and Merriman except for their salutations. Despite that ruling, which the prosecutor acknowledged he understood, the prosecutor asked Fitzgerald whether Merriman "offer[ed] to send [defendant] a manual from San Quentin?" Fitzgerald responded, "Yes, he [did]." The court promptly sustained defense counsel's objection, ordered the answer stricken, and admonished the jury to disregard it, telling the prosecutor, "I ruled from the bench on that issue . . . ."

At a bench conference immediately after the conclusion of Fitzgerald's testimony, defense counsel moved for a mistrial based on the prosecutor's question regarding the San Quentin manual, arguing that the inquiry was a violation of the court's order and highly prejudicial to defendant. Before ruling on the motion, the court excused the jury for the day. In giving its usual admonishments, the court added, "I want to admonish you again the objection made to a question asked by the district attorney in reference to an item allegedly contained in a letter from a Mr. Merriman to defendant — objection made to it. I sustained the objection. The answer was stricken. [¶] I want to admonish you again you're not to consider anything that you heard in that answer for any purpose whatsoever in this case."

The court heard from the parties on the motion. The prosecutor apologized for eliciting testimony in violation of the court's earlier ruling but asserted that no prejudice resulted.

The court responded, "I sure don't like it, and I can understand [defense counsel's] concern completely." The court nonetheless denied defendant's motion for mistrial, concluding that the misconduct would not have inflamed the jurors against defendant. The court explained, "it does seem to the Court the jury's already aware that at a minimum the defendant's going to spend the rest of his life in prison . . . . [¶] I think the reality [is] that the jurors are not foolish, stupid idiots but do indeed follow the law as the Court instructs and will do so in this case."[13]

Later, when instructing the jurors before their penalty phase deliberations, the court read CALJIC No. 1.02, which, as given, reminded the jurors not to consider "for any purpose . . . any evidence that was stricken by the court" but to "treat it as though you had never heard it."

### b. *Discussion*

We agree with defendant that the prosecutor committed misconduct by eliciting testimony regarding the contents of one of the letters Merriman wrote to defendant. (See *People v. Tully* (2012) 54 Cal.4th 952, 1035.) The trial court had ruled clearly that the contents of the letters were inadmissible. The prosecutor nonetheless directly asked Fitzgerald a question regarding the contents of one letter. Although the prosecutor apologized for asking the question, he offered no excuse or explanation for his conduct. This was clear misconduct, not a situation in which a question led to "a witness's nonresponsive

---

[13]  The prosecutor stated during this colloquy that he believed the manual referred to in the letter was a document published by prison officials "about what it's like [in San Quentin State Prison]."

answer that the prosecutor neither solicited nor could have anticipated." (*Ibid*.) We take this opportunity to admonish counsel regarding the importance of strictly adhering to a court's rulings concerning the scope of proper examination. Such adherence is important in every case. It certainly is no less vital in the context of a capital case.

Still, the prosecutor's error did not require the court to declare a mistrial. " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Williams* (2006) 40 Cal.4th 287, 323, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854.) As we have explained, "[a] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . ." (*People v. Bolden* (2002) 29 Cal.4th 515, 555, citing *People v. Ayala* (2000) 23 Cal.4th 225, 282; see *People v. Jenkins* (2000) 22 Cal.4th 900, 986 [court should grant a mistrial if it determines the prejudice "incurable by admonition or instruction"].)

Reviewing the court's denial of the mistrial motion for an abuse of discretion (*People v. Valdez* (2004) 32 Cal.4th 73, 128, citing *People v. Ayala*, *supra*, 23 Cal.4th at p. 283), we conclude the court did not err. We presume that a jury follows the court's admonishments. (*People v. Avila* (2006) 38 Cal.4th 491, 574, citing *People v. Boyette* (2002) 29 Cal.4th 381, 436.) Here, after scolding the prosecutor in open court for violating its earlier ruling, the court promptly and forcefully directed the jury to disregard the improper question and response. The court did so repeatedly, both at the time the court sustained the defense objection and again, a short time later, when the court excused the jury for the day. The jury was also instructed in more

general terms prior to penalty phase deliberations that it was not to consider for any purpose evidence stricken by the court.

The court acknowledged defense counsel's concerns that the improper question and response could lead the jury to speculate regarding the contents of the San Quentin "manual" in ways that could prejudice defendant. But the court also reasonably concluded its admonishments would ensure that the brief reference to an undescribed "manual" did not irreparably damage defendant's chance of receiving a fair penalty trial.

Citing empirical research suggesting generic instructions are of limited value in curing prejudice, defendant asserts that the three "anemic" admonitions did not effectively dispel the prejudice. But nothing in the record provides any reason to question the court's belief that the prejudice resulting from the improper evidence was cured by the court's prompt and explicit directives that the jury disregard it. Nor does the record disclose any reason for this court to cast aside the presumption that the jurors followed the court's repeated admonishments. We conclude the trial court did not abuse its discretion in denying the motion for a mistrial.

## B. Victim Impact Testimony

The prosecution called to the witness stand three members of Cynthia Burger's immediate family to testify regarding how they were impacted by her death. Defendant contends the testimony by two of the witnesses fell outside the scope of constitutionally permissible victim impact evidence. He further complains that the testimony was emotionally overwrought and thereby diverted the jury from its proper role at the penalty phase. As we explain, the admission of the challenged testimony was proper.

### 1. Background

Prior to trial, defense counsel filed a motion to limit any victim impact testimony proffered by the prosecution. After a brief hearing on the motion, the court rejected the defense argument that such evidence should be limited to testimony by only those family members who were actually present at the crime scene. But the court agreed to limit the evidence to testimony from three immediate family members — Burger's father (Had Burger), mother (Virgie Burger), and sister (Sandra Woodward).

Mr. Burger testified briefly regarding how much his daughter had meant to him, his deep sense of shock and grief upon learning she had died, and the enduring feeling of emptiness that could not be filled after her death.

Mrs. Burger testified next. In explaining what her daughter meant to her, Mrs. Burger described the circumstances surrounding Burger's birth, including that Mr. Burger drove 500 miles to the hospital and was there to hold their newborn child. Mrs. Burger explained how that event created a special bond between Burger and Mr. Burger because he could not attend the birth of their first child, which occurred during World War II when he was stationed at Guadalcanal. She also mentioned that she was very ill following the birth and that family members supported her.

Mrs. Burger mentioned her daughter's dedication to Jesus, saying, "Jesus Christ was her hero." She talked about Burger's desire to be the best person she could be, and about her graduation from Calvary Bible College. When asked to recount how she learned her daughter had died, Mrs. Burger described the news as "a horrendous story by a monster" and called the

killing a "weird, horrible story." According to Mrs. Burger, her heart broke that day and has never healed. She also expressed how much she missed Burger, who she described as a "wonderful daughter, beautiful daughter, kind, considerate." When relating some of the hardest things for her after Burger's death, Mrs. Burger discussed having to walk through her daughter's home, including the bedroom where she had been strangled. She also mentioned the loss of the family Bible in the fire. Mrs. Burger found some solace in having a close and loving family. After bringing Burger's cats to live with her and her husband, Mrs. Burger would "feel the [cats'] fur and I knew that I was feeling Cindy's hands stroking that little kitty." After Burger's death, Mrs. Burger explained that she suffered poor health and depression, and that she lived in fear at night when her husband was not home.

Burger's older sister, Sandra Woodward, explained that she and Burger had "something magic" between them, even when Burger was an infant. When she learned Burger was dead, she was shocked and suffered intense, unrelenting pain. Woodward said she knew everything about Burger and had taken for granted that she and her sister would grow old together. She recounted how difficult it was to answer police investigators' questions about Burger's friends and acquaintances, and to inventory Burger's house to identify what was missing. According to Woodward, it was hard to control her suspicions about Burger's friends during the long investigation.

In describing her experience at the mortuary, Woodward recalled that her sister's hair and features were unrecognizable and that she struggled with how to tell her parents. She related that her father did not want to see Burger's body because he "wanted to remember how Cindy was last week." When

Woodward returned to the mortuary with Mrs. Burger, Woodward could see the grief washing over Mrs. Burger as she (Mrs. Burger) rocked Burger in her arms.

Woodward testified that she had trouble sleeping after Burger's death, and that she would often wake around 3:00 a.m. She said that when she later was told that defendant entered Burger's home "between 2:30 or 3:00, I just had a stab to my heart. It all made sense to me. I knew why I was waking up at 3 o'clock. There was no doubt in my mind."

Woodward also told the jury that although she finds joy in her memories of her sister, she is saddened knowing they will no longer have special times together. Woodward explained that her sister's death traumatized the family, each of whom dealt with his or her grief differently. Specifically, her father became angry and hard, while her mother cried all the time because she "worried about the pain and the torture that Cindy went through and she kept reliving it." Woodward also described her own physical pain, including difficulty breathing. She stated that when another individual told her she was experiencing heartache, she said, "I didn't realize there was such physical pain with death."

### 2. *Discussion*

Defendant raises three challenges to the victim impact testimony. First, he argues that the testimony by Mrs. Burger and Ms. Woodward exceeded the limitations the high court placed on victim impact evidence in *Payne v. Tennessee* (1991) 501 U.S. 808 (*Payne*). *Payne* departed from earlier precedent to hold that the Eighth Amendment does not bar states from allowing at a capital sentencing proceeding evidence regarding the loss to the victim's family that resulted from the murder, so

long as the evidence is not "so unduly prejudicial" that it leads to a "fundamentally unfair" trial. (*Payne, supra*, 501 U.S. at p. 825; see also *People v. Edwards* (1991) 54 Cal.3d 787, 835 [holding that § 190.3, factor (a) authorized "evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim"].) *Payne* did not disturb the high court's earlier holding in *Booth v. Maryland* (1987) 482 U.S. 496, however, that "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." (*Payne, supra*, 501 U.S. at p. 830, fn. 2; see also *People v. Taylor* (2010) 48 Cal.4th 574, 647–648.)

Defendant argues that the testimony by Burger's mother and sister exceeded the permissible scope of victim impact evidence under *Payne*. He asserts that Burger's mother and sister offered improper opinions regarding the crime and defendant. Specifically, defendant points to Mrs. Burger's characterization of the facts of Burger's death as "a horrendous story by a monster" and a "weird, horrible story." He emphasizes Mrs. Burger's testimony that "[t]his girl was so beautiful both inside and out and was murdered with great pain, fear, and then set [on] fire, and then put in a tub of acid." Defendant also complains that Woodward's testimony regarding the police investigation invited the jury to speculate that numerous individuals beyond the immediate family had been adversely impacted by Burger's death. Defendant further asserts that the testimony from Burger's mother and sister ran afoul of *Payne* because it was distracting, emotional, and irrelevant. He points to testimony from both women regarding the circumstances of Burger's birth, Burger's religious convictions, and the "psychic connections" described by the

witnesses (Mrs. Burger's testimony that she would pet Burger's cats and know "that I was feeling Cindy's hands stroking that little kitty," and Woodward's testimony that she would often wake up at 3:00 a.m., around the time Burger was killed).

As an initial matter, defendant failed to object to these statements during trial. Defendant moved before trial to limit any victim impact testimony to those family members present during or immediately after the crime, and to exclude any prejudicially emotional victim impact testimony. The trial court granted the motion to the extent that defendant sought to limit testimony to impacted family members but stated those witnesses need not have been present during the crime. Rather, the court ruled that testimony from Burger's mother, father, and sister would be admissible to describe the impact of Burger's death on them. Defendant did not subsequently object that the witnesses' testimony exceeded the scope of the trial court's order or was otherwise improper. As the Attorney General asserts, and defendant does not contest, defendant's claims are therefore forfeited. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 46 ["denial of the motion in limine [to exclude all victim impact testimony] did not make objection during testimony redundant, but rather it was incumbent on defendants to object if they believed the testimony actually presented was 'excessive, improper, inflammatory, and highly prejudicial' "].)

Even considering defendant's claims on the merits, however, the challenged statements did not run afoul of the Eighth Amendment. Neither Mrs. Burger nor Ms. Woodward improperly commented on the crime or defendant. When placed in context, Mrs. Burger's references to the horrendous nature of the crimes against her daughter, and the suffering that she imagined her daughter must have endured, reflected how those

crimes had directly affected *her* (Mrs. Burger). (See *People v. Mendez* (2019) 7 Cal.5th 680, 713 [permitting testimony of family members describing how they imagined their loved ones' final moments, and describing as "obvious" that a parent would describe a child's murder as a " 'tragic, sickening, evil, disgusting death' "]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1182 [rejecting the defendant's challenge to testimony by the victims' son describing his parents' murders as brutal and " 'a savage act' "].) Likewise, Mrs. Burger's characterization of her daughter's killer as a "monster" was a permissible expression of the harm caused by the crimes. (See *People v. Taylor*, *supra*, 48 Cal.4th at p. 647 [one family member's fleeting reference to the defendant as " 'that idiot' " reflected how the murder had devastated her and the victim's large family and close friends].) Mrs. Burger's testimony was properly admitted to remind the jury that Burger was " 'an individual whose death represents a unique loss to society and in particular to [her] family.' " (*Payne, supra*, 501 U.S. at p. 825, quoting *Booth v. Maryland*, *supra*, 482 U.S. at p. 517 (dis. opn. of White, J.).)

Further, defendant does not explain how Woodward's testimony regarding the investigation improperly broadened the scope of testimony regarding those impacted by Burger's death. At most, her testimony stated what was obvious; Burger's death generally impacted those who knew her. Woodward's general testimony that officers investigating the crime questioned those close to Burger was not so emotional as to invite an irrational response from the jury. (See *People v. Winbush*, *supra*, 2 Cal.5th at p. 465 [rejecting similar claim when victim's sister and mother described impact of murder on victim's father, who was " 'totally devastated' " and died six months after the murder].)

Nor can the testimony here be characterized as irrelevant, distracting, or unduly emotional. Contrary to defendant's assertion, Mrs. Burger could properly describe some of the circumstances surrounding Burger's birth because, by showing the supportive and loving family environment in which Burger was raised, the testimony provided the jury a glimpse of who Burger was. (See *People v. Dykes* (2009) 46 Cal.4th 731, 786 [victim impact evidence offers the jury "an idea of who the victim was"].) As we have repeated, " '[t]he People are entitled to present a " 'complete life histor[y] [of the murder victim] from early childhood to death.' " ' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1286, quoting *People v. Garcia* (2011) 52 Cal.4th 706, 751; accord, *People v. Zamudio* (2008) 43 Cal.4th 327, 365.)

For a similar reason, Mrs. Burger's references to her daughter's trust in Jesus and graduation from a Christian college were not improper. We denied a similar challenge to testimony regarding a murder victim's participation in Bible study classes in *People v. Pollock, supra*, 32 Cal.4th at page 1181. Although we noted that the testimony there did not include mention of the victim's "specific religious beliefs" (*ibid*.), the testimony here was brief and limited to a general description of Burger as a devout Christian. And, like in *Pollock*, nothing in the record supports defendant's assertion that this testimony would have suggested to the jury that its penalty decision should be guided by religious doctrine, let alone his claim that these references "cast a mantle of saintliness about [Burger] and invited the jury to recall the Old Testament call to take vengeance for the righteous."

Further, we find untenable defendant's contention that the testimony by Mrs. Burger and Woodward relating their

thoughts about Burger subsequent to her death (which defendant characterizes as "psychic connections") would have invited jurors to believe Burger's spirit would be watching over their deliberations. We have previously rejected similar challenges to " 'supernaturally tinged' " evidence such as a murder victim's mother describing a nightmare about being shot just before learning her son had been shot (*People v. Mendez, supra*, 7 Cal.5th at p. 713) and a witness describing that the victim's goddaughter reported seeing the victim's ghost after the victim was killed (*People v. Verdugo* (2010) 50 Cal.4th 263, 297–299).

Defendant also urges us to revisit our holding in *People v. Edwards, supra*, 54 Cal.3d 787, that section 190.3, factor (a) allows victim impact evidence, and those decisions declining to limit such evidence to the facts and circumstances that the defendant knew or reasonably should have known at the time of the crime. He cites to language in Justice Kennard's concurring and dissenting opinion in *People v. Fierro* (1991) 1 Cal.4th 173, 264. We have declined to adopt that language, and defendant provides no persuasive reason to reopen our consideration of these issues. (See, e.g., *People v. Simon* (2016) 1 Cal.5th 98, 140–141; *People v. Jones* (2012) 54 Cal.4th 1, 70; *People v. Myles* (2012) 53 Cal.4th 1181, 1219; *People v. McKinnon, supra*, 52 Cal.4th at p. 690.)

Finally, defendant asserts that the victim impact testimony was far more prejudicial than probative and that the court should not have allowed the jury to consider it when deciding the appropriate punishment. Again, the claim is forfeited because defendant failed to object. And, again, defendant's claim fails on its merits. Testimony regarding grief and loss is necessarily emotional, but that does not necessarily

render it inadmissible. Here, the testimony of Burger's father, mother, and sister, which included their descriptions of the shock and grief they experienced on learning of Burger's death, was the type of evidence typically permitted at the penalty phase and "concerned the kinds of loss that loved ones commonly express in capital cases." (See *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1057; see also *People v. Myles, supra,* 53 Cal.4th at p. 1197 [victim's father related to the jury that when he was informed of his son's death, he fell to his knees and dropped the telephone in disbelief].) Nor was it error to allow Mrs. Burger's testimony describing the emotion she felt listening to trial testimony or testifying herself. Testimony describing the " 'residual and lasting impact' " of a murder on the victim's family is permissible. (*People v. McKinnon, supra,* 52 Cal.4th at p. 691, quoting *People v. Brown* (2004) 33 Cal.4th 382, 398.)

Characterizing the victim impact testimony as "duplicative and excessive," defendant faults the court for not attempting to lessen the prejudicial effect by, for example, allowing only one of the three members of Burger's immediate family to testify. The record shows that the victim impact testimony in this case was neither duplicative nor excessive. Indeed, the testimony represented only 20 pages in a reporter's transcript of the prosecution's case in aggravation that spanned several hundred pages. (See, e.g., *People v. Mendez, supra,* 7 Cal.5th at p. 712 [stating that allowing three victim impact witnesses per murder victim is comparable to what this court has previously condoned]; *People v. Williams, supra,* 61 Cal.4th at p. 1285 [rejecting challenge to amount of victim impact testimony involving ten witnesses].) We discern no error in the trial court's decision to allow the testimony here.

Nor did the testimony unduly prejudice defendant by painting a contrasting picture for the jury, effectively asking the jury to compare Burger's life with defendant's and to "base its punishment decision on which life was more valuable to society." Nothing in the record supports this assertion, and we have previously rejected similar unsupported claims. (See *People v. Winbush*, *supra*, 2 Cal.5th at p. 465; *People v. Kelly* (2007) 42 Cal.4th 763, 799.)

## C. Unadjudicated Criminal Activity

Defendant contends that section 190.3, factor (b), which permits evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force of violence," violates the Eighth Amendment to the federal Constitution.

The purpose of section 190.3, factor (b) is to "enable the jury to make an individualized assessment of the character and history of a defendant to determine the nature of the punishment to be imposed." (*People v. Grant* (1988) 45 Cal.3d 829, 851.) This court has long held that the admission of evidence of unadjudicated crimes at the penalty phase is not a violation of state or federal constitutional principles. (See, e.g., *People v Jenkins*, *supra*, 22 Cal.4th at p. 1054; *People v. Balderas* (1985) 41 Cal.3d 144, 204–205.)

Defendant mischaracterizes section 190.3, factor (b) as allowing evidence of irrelevant everyday "spats and quarrels." In fact, the statute allows the use of criminal activity related to force or violence, or what we have described as "prior violent conduct." (*People v. Davis* (1995) 10 Cal.4th 463, 544.) The jury is instructed that it may consider evidence of such prior conduct only when the conduct has been proved beyond a reasonable

doubt. (*People v. Robertson* (1982) 33 Cal.3d 21, 53.) As we have explained, "[t]he penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard; the reasonable doubt standard ensures reliability; and the evidence is thus not improperly prejudicial or unfair." (*People v. Balderas, supra,* 41 Cal.3d at p. 205, fn. 32.) Defendant was entitled to argue to the jury that the incidents were mere minor spats and should be given little weight. (See *People v. Tully, supra,* 54 Cal.4th at p. 1030 ["Whether defendant's use of force was legally justified and the weight, if any, to be given to these incidents for purposes of the individualized assessment of his character and history were matters for the jury to decide in light of the instructions given to it"].)

Defendant further asserts that the admission of unadjudicated acts through anecdotal evidence violates the Eighth Amendment's requirement of heightened reliability in capital cases because, as a general matter, only the victim's recollection is presented to the jury. We have repeatedly rejected claims that the admission of section 190.3, factor (b) evidence violates a defendant's right to a reliable penalty determination. (See, e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 584–585.) Defendant's complaint that only the *victim's* version of events is the one heard by the jury is remedied by his Sixth Amendment right to confront the witnesses who testify against him at the penalty phase. (See *People v. Rogers* (2006) 39 Cal.4th 826, 894.)

Defendant also asserts that the admission of evidence under section 190.3, factor (b) violates the Eighth Amendment because it is out of step with evolving standards of decency. We

have not previously considered this particular challenge to section 190.3, factor (b). We reject it now.

Defendant asserts that section 190.3, factor (b) is "the only statute in the country to include a statutory aggravator that allows a jury to impose the death penalty based upon unadjudicated everyday spats and quarrels." He acknowledges, however, that other states allow consideration of unadjudicated acts as a nonstatutory aggravating factor.

Indeed, at least seven other states allow the admission of unadjudicated acts in a similar fashion as California. (See, e.g., *Devier v. State* (Ga. 1984) 323 S.E.2d 150, 163 [allowing as an aggravating factor "[a]ny lawful evidence," including prior unadjudicated acts, that tend to show a defendant's "general moral character" or "predisposition to commit other crimes"]; *State v. Johns* (Mo. 2000) 34 S.W.3d 93, 113 [allowing consideration of evidence of defendant's "character and conduct," including unadjudicated criminal conduct that occurred before or after the capital offense]; *Paxton v. State* (Okla. 1993) 867 P.2d 1309, 1321–1323 [allowing unadjudicated offenses to support aggravating circumstance of continuing threat to society]; *State v. Tucker* (Or. 1993) 845 P.2d 904, 913 [allowing evidence of unadjudicated "bad acts" as an aggravating factor related to defendant's future dangerousness]; *Powell v. State* (Tex. 1994) 898 S.W.2d 821, 830 [allowing unadjudicated "extraneous offenses" to show defendant poses a future danger to society]; *State v. Taylor* (Utah 1991) 818 P.2d 1030, 1035 [allowing violent and nonviolent unadjudicated crimes as an aggravating factor relevant to defendant's character]; *Stockton v. Commonwealth* (Va. 1991) 402 S.E.2d 196, 209–210 [construing applicable statute as allowing evidence of unadjudicated misconduct, rejecting due process

challenge to that practice, and noting split between states allowing or prohibiting admission of such evidence].)

That California is among eight states allowing consideration at the penalty phase of prior unadjudicated criminal activity involving force or violence is not sufficient to establish that California's statutory scheme is out of step with evolving standards of decency or otherwise violates the Eighth Amendment. (See *People v. Taylor*, *supra*, 48 Cal.4th at p. 634; cf. *Miller v. Alabama* (2012) 567 U.S. 460, 469–470, 479 [holding that mandatory imposition of life without parole sentences for juvenile offenders violated 8th Amend. evolving standards of decency].)

### D. Constitutionality of California's Death Penalty Law

Defendant presents several challenges to the constitutionality of California's death penalty law that, he acknowledges, this court has previously considered and rejected. We decline his request to reconsider our prior conclusions. (*People v. Schmeck* (2005) 37 Cal.4th 240, 303.)

Section 190.2 provides a list of the special circumstances, including felony murder, which render a defendant eligible for the death penalty. These factors are not so numerous and broadly interpreted that they fail to narrow the class of death-eligible first degree murders as required by the Eighth and Fourteenth Amendments. (*People v. Brooks* (2017) 3 Cal.5th 1, 114–115 (*Brooks*); *People v. Johnson* (2016) 62 Cal.4th 600, 654–655 (*Johnson*).)

Section 190.3, factor (a), directs the jury to consider as evidence in aggravation the circumstances of the capital crime. This has not resulted in the wanton imposition of the death

penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments by permitting prosecutors to argue that the various features of the murder, even features that are the converse of those in other cases, are aggravating factors. (*Johnson, supra,* 62 Cal.4th at p. 655; *People v. Brown, supra*, 33 Cal.4th at p. 401.)

Defendant raises various challenges to the procedural aspects of a penalty phase trial. This court has repeatedly rejected those challenges. The federal Constitution does not require "either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Penal Code section 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235, citing *People v. Whalen* (2013) 56 Cal.4th 1, 90, *People v. Dykes, supra*, 46 Cal.4th at p. 814, *People v. Avila, supra*, 38 Cal.4th at p. 724; see also *Johnson, supra*, 62 Cal.4th at pp. 655–656; *People v. Linton* (2013) 56 Cal.4th 1146, 1215–1216.) Neither the federal Constitution nor state law requires the jury be instructed that the prosecution bears some burden of proof as to the truth of the aggravating factors (other than factor (b) or (c) evidence) or the appropriateness of a death verdict. Nor is the court required to explicitly tell the jury that neither party bears the burden of proof. (*Linton, supra*, 56 Cal.4th at p. 1215.) The high court's decisions interpreting the Sixth Amendment in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and its progeny do not compel a different conclusion. (*People v. Merriman, supra*, 60 Cal.4th at p. 106.)

There is no federal constitutional requirement, either under the Fifth, Sixth, Eighth, or Fourteenth Amendments, that the

jury make unanimous findings regarding the aggravating factors or the truth of the unadjudicated criminal activity admitted under section 190.3, factor (b).  (*People v. Clark* (2011) 52 Cal.4th 856, 1007; *People v. Balderas, supra,* 41 Cal.3d at pp. 204–205.)

The standard instructions governing the jury's deliberative process at the penalty phase are not constitutionally infirm.  Informing the jury that a death verdict is " 'warranted' " if the aggravating factors are " 'so substantial' " in comparison with the mitigating factors is not impermissibly broad or vague.  (*People v. Arias* (1996) 13 Cal.4th 92, 171; *People v. Breaux* (1991) 1 Cal.4th 281, 315–316.)  The jury need not be instructed that it must return a verdict of life without the possibility of parole if it finds the mitigating circumstances outweigh the aggravating circumstances.  (*People v. Duncan* (1991) 53 Cal.3d 955, 978.)  There is no requirement that the jurors be instructed that a defendant bears no burden of proving the facts in mitigation, or that mitigating circumstances did not have to be found unanimously.  (*People v. Brasure, supra*, 42 Cal.4th at pp. 1068–1069.)  And the death penalty law does not require the jury be instructed that there is a presumption that life without possibility of parole is the appropriate sentence.  (*Arias, supra*, 13 Cal.4th at p. 190.)

The penalty phase jury is not required to make written findings regarding its penalty choice, and the absence of such written findings does not preclude meaningful appellate review.  (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1364, abrogated on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; *People v. Fauber* (1992) 2 Cal.4th 792, 859.)

The court's instructions regarding the various aggravating and mitigating factors did not act as a barrier to the jury's consideration of defendant's mitigating evidence or infringe defendant's constitutional rights. An instruction reflecting section 190.3's use of adjectives such as "extreme" and "substantial" in factors (d) and (g) does not interfere with a defendant's right to present mitigating evidence. (*Brooks, supra*, 3 Cal.5th at p. 115; *People v. Adcox* (1988) 47 Cal.3d 207, 270.) Nor must a court delete from the instructions any inapplicable mitigating factors, or identify which factors are aggravating and which are mitigating. (*People v. Cook* (2006) 39 Cal.4th 566, 618.) Directing the jury to consider " 'whether or not' " certain mitigating factors were present does not invite the jury to use the absence of such factors as a factor in aggravation. (*Johnson, supra*, 62 Cal.4th at p. 656.)

The failure of California's death penalty procedures to provide for intercase proportionality review does not violate the federal Constitution or principles of equal protection or due process. (*Brooks, supra*, 3 Cal.5th at p. 115; *People v. Verdugo, supra*, 50 Cal.4th at p. 305.)

The failure to afford capital defendants at the penalty phase the same procedural safeguards provided to noncapital defendants does not violate the equal protection clause pf the federal Constitution. (*People v. Whalen* (2013) 56 Cal.4th 1, 91, disapproved on another ground in *People v. Romero and Self, supra*, 62 Cal.4th at p. 44, fn. 17.)

California does not regularly use the death penalty as a form of punishment, and "its imposition does not violate international norms of decency or the Eighth Amendment's

prohibition against cruel and unusual punishment." (*People v. Clark, supra*, 52 Cal.4th at p. 1008.)

Defendant acknowledges that this court has previously rejected each of the challenges to California's death penalty scheme that he presents here. He asserts, however, that our analysis of these issues is constitutionally defective because we have failed to consider their cumulative impact or to address the capital sentencing scheme as a whole. This court has considered and rejected identical arguments before, and we do so again here. (See, e.g., *People v. Amezcua and Flores* (2019) 6 Cal. 5th 886, 928; *Johnson, supra*, 62 Cal.4th at pp. 657–658.)

## V. CUMULATIVE EFFECT OF ASSERTED ERRORS

Defendant argues that the asserted errors that occurred during the guilt and penalty phases, when considered cumulatively, deprived him of a fair trial. We have assumed for purposes of argument that the recording of Burger's last telephone call and Magee's testimony regarding the DNA extraction conducted by Yates should not have been admitted, but concluded that any error was harmless. (See *ante*, pts. III.A, & III.B.) We have also assumed that the salutations in correspondence from Merriman to defendant were inadmissible hearsay, but likewise concluded that defendant was not prejudiced by any error in the admission. (See *ante*, pt. IV.A.1.b.iii.) And we have concluded that the prosecution committed misconduct by eliciting statements from a rebuttal witness during the penalty phase regarding the contents of one of those letters, but that the trial court did not abuse its discretion in denying the defendant's related motion for a mistrial. (See *ante*, pt. IV.A.2.) Considering these together, we

likewise conclude the cumulative effect of the asserted errors was harmless.

## VI. CONCLUSION

We affirm the judgment in its entirety.


**CANTIL-SAKAUYE, C. J.**


**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**GOETHALS, J.\***

---

\*    Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Schultz

_____

**Unpublished Opinion**
**Original Appeal**  XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S114671
**Date Filed:**  November 23, 2020

_____

**Court:**  Superior
**County:**  Ventura
**Judge:**  Donald D. Coleman

_____

**Counsel:**

Jeralyn Keller, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General,  Lance E. Winters, Assistant Attorney General, Jaime L. Fuster, Joseph P. Lee and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeralyn Keller
790 East Colorado Blvd., Suite 900
Pasadena, CA 91101-2113
(626) 683-1233

Ryan M. Smith
Deputy Attorney General
300 South Spring St., Suite 1702
Los Angeles, CA 90013
(213) 269-6108