Filed 2/7/24  P. v. Sosa CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B324963 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA154790) |
| v. | |
| VICTOR SOSA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Victor Sosa (defendant) appeals from his murder conviction, asserting the trial court abused its discretion in denying his request to prohibit the prosecution from referring to a "sexual assault kit" by that name. We find no abuse of discretion and defendant has not established he suffered prejudice from the use of the term. Accordingly, we affirm the judgment.

## BACKGROUND

Defendant was convicted of the murder of Daisy De La O in violation of Penal Code section 187, subdivision (a), and the allegation that defendant personally used a dangerous and deadly weapon, a knife, within the meaning of section 12022, subdivision (b)(1) was found true. On August 2, 2022, defendant was sentenced to a prison term of 25 years to life, enhanced by one consecutive year pursuant to section 12022, subdivision (b)(1).

Defendant filed a timely notice of appeal from the judgment.

**Trial evidence**

Daisy's grandfather Juan De La O (Juan)[1] testified that prior to Daisy's death he had lived with Daisy, her mother, younger brother and other family members for a year or two in a second floor apartment on Long Beach Boulevard. He had seen Daisy with her boyfriend, whom he identified as defendant, but had never spoken to him. On several occasions, Juan saw them chatting, but not kissing or hugging, although they looked

---

[1] As Juan has the same surname of the victim, we call them both by their first names to avoid confusion.

content together.  Defendant occasionally came into the family residence.

On February 22, 2021, Juan got home from work at 5:00 p.m.  He was in the living room watching TV and chatting with Daisy, her mother and his brother-in-law, when he saw a man he presumed was defendant at the window.  Juan saw only his eyes, as he was wearing a mask, cap, and a beanie.  Both the mask and the beanie were red, black, and white.  About 10 minutes later, around 10:30 p.m., Daisy left after kissing her mother and grandmother, saying goodbye and, "Mom, l'll be back later."  Later in his room, with the window open, Juan could hear Daisy's voice and a male voice, murmuring.  He then closed his window and went to bed.

Fourteen-year-old Jeffrey T. lived downstairs from Daisy's family in the unit closest to the alley.  Jeffrey saw Daisy around their multibuilding apartment complex almost every day and had seen her with her boyfriend, whom he identified as defendant.  He had seen them kiss.  Jeffrey usually saw Daisy and defendant every night between buildings in a grassy area near gas tanks with a metal cover.  On or about February 22 around 11:35 p.m. Jeffrey was returning from his cousin's apartment in a different building across the courtyard from his, when he saw Daisy and defendant in front of his building.  Daisy was lying on her side near the stairs and defendant was walking back and forth with his head down, wearing his usual all black clothing.  Defendant did not acknowledge Jeffrey, and Jeffrey heard nothing.  He could not tell whether Daisy was awake or asleep.  Jeffrey testified that he was within five feet when he passed Daisy and defendant.  Daisy was not crying, but looked like she was resting.  Jeffrey could not see their faces and did not see a beanie, but he had seen

defendant many times and recognized him that night by his long black hair.

Jeffrey then went into his apartment, brushed his teeth, and went to his bedroom. The view from his bedroom window was a sort of shortcut between buildings, where Jeffrey had previously seen Daisy and defendant kissing. About an hour after he had been in his room Jeffrey heard a noise like the sound of dragging paper or wrappers on the floor for about 10 seconds. He ignored it and went to bed. He heard no more noises after that.

The next morning the manager of the apartment complex, Jose Tellez, saw a rug next to a trash container, the same rug he had previously seen rolled up against one of the buildings. Inside he found a dead body. Law enforcement arrived about 30 minutes later.

Tellez had seen Daisy around the complex during the previous six months and knew she lived there with her mother and grandfather. He had also seen Daisy with a person he thought was her boyfriend, because he saw them hugging and kissing. One afternoon he saw them under a blanket on the covering over the gas meters in the alley. It was the same alley where he found the body. Tellez had told them they could not be there because there were children around who he did not want to see that.

Another resident in the complex, Ben Montes, testified he had installed a surveillance camera at the top of his building above the alley because it was a high-crime area and there had been thefts and prostitution there.[2]

---

[2]     A video recording of the night of February 22 and 23, 2021, was admitted into evidence, but not made a part of the record on

Defendant's mother Claudia Gutierrez testified that defendant lived with her in February 2021 and that he was 24 years old at that time. Daisy was his girlfriend of about three years, but Gutierrez was not sure whether they were still dating in February 2021. She had met Daisy only a couple times.

When defendant did not come home after February 22, Gutierrez worried. On February 25, 2021, she filed a missing person report with the local police department. She tried texting defendant and Daisy but received no reply. Gutierrez's niece told her about Daisy's death. About two weeks later defendant phoned Gutierrez, and they met on the street. She asked him whether he had killed Daisy and told him to do the right thing. Defendant gave no response, but put his head down. He asked for money to pay off some "stuff" he owed. Gutierrez gave him $500. Defendant never again came home.

Criminalists who collected evidence from Daisy's body testified about the collection or testing of swabs taken of bodily fluid and epithelial cells in search of DNA evidence. Courtney Castellino, a senior criminalist with the Los Angeles County Department of Medical Examiner-Coroner, testified that a "sexual assault kit" contains a standard set of swabs and was used because Daisy's pants were pulled down below her buttocks.

---

appeal. As the recording was shown to the jury the witness pointed out shadows that could be seen. Defendant argues that two people can also be seen in the video, but no testimony was admitted to that effect. "[D]efendant has the burden of providing a record adequate to support his arguments on appeal." (*People v. Malabag* (1997) 51 Cal.App.4th 1419, 1427.) "'"(M)atters not presented by the record cannot be considered on the suggestion of counsel in the briefs."'" (*In re Rogers* (1980) 28 Cal.3d 429, 437, fn. 6.)

A criminalist took swabs from her hips, the anal opening and rectal area, breasts, genital and pubic area. Swabs were also taken from Daisy's pants, clothing, hair, mouth, and neck. A tampon was in place and collected for evidence, but Daisy's vagina was not swabbed. Other items found in the area that were also swabbed or collected: a steak knife, a set of keys, a yellow and blue beanie, and various bloodstains.

The swabs and other items were tested for DNA. Daisy's DNA and the DNA of an unknown contributor were found on a sample taken from the top of the rug, while a bloodstain from the bottom of the rug contained Daisy's and defendant's DNA. Defendant's DNA was found in a bloodstain on the knife blade, while the rear half of the knife handle contained Daisy's DNA and the DNA of an unknown individual. Both defendant's and Daisy's DNA were found on the front part of the knife handle. The DNA on the keys and key ring belonged to Daisy, defendant and an unknown individual. The DNA in a bloodstain on one wall was Daisy's and on another wall belonged to defendant.

An anal epithelial sample and an external genitalia epithelial sample revealed Daisy's and defendant's DNA. There was insufficient sperm on all swabs to prepare a profile except on the tampon, which contained both Daisy's and defendant's DNA. A criminalist explained that seminal fluid will still test positive after being on the body for a few days, depending on how frequently the person bathes or changes underwear.

An autopsy was performed on Daisy, who was, at the time of death, 19 years old, five feet tall, and weighed 137 pounds. She suffered multiple sharp force type injuries on the right side of her head and neck, and some bruises on her upper arms, which occurred before death and appeared to be several hours old. The

fatal wound was the sharp force injury on her neck. It was a long incise wound, inflicted either from the front or behind, that went from the left to right, measuring about five inches long and a little over one inch deep. It was inflicted with a sharp instrument, such as a knife, which cut the right common carotid artery, the main branch of the jugular vein, the vagus nerves, muscles, and the trachea. Fifty-eight shallow wounds to the head of various different angulations and sizes were found, each with a maximum length of one inch. Only the tip of the sharp instrument penetrated the scalp.

## DISCUSSION

Defendant's sole contention on appeal is that the trial court abused its discretion under Evidence Code section 352 by permitting the prosecution to refer to a sexual assault kit by that name, despite the fact defendant was not charged with sexual assault. Defendant argues the court should have required a more neutral term for the kit because the term was "irrelevant and unnecessary to either its admission or probative value." As he did below, defendant suggests that a term such as "physical assault kit" would have been less prejudicial.

Prior to jury selection defense counsel asked for an order prohibiting the prosecution from asking witnesses questions about rape or sexual assault, as defendant was not charged with either crime. The court granted that request but noted "it seems that it is relevant how the victim was found in regards to if there was the testing for DNA, which I believe there was, and where the testing occurred. So that seems to be relevant."

Following jury selection and prior to opening statements, defense counsel asked the court to require the prosecution to

refer to the sexual assault kit as a physical assault kit or just an assault kit.  The prosecutor replied there was no sexual assault report, no sexual assault or rape charge against defendant, no evidence of a sexual assault, and the criminalists would testify that the kit was prepared because the body was found with her pants pulled down, exposing the buttocks, and her sweatshirt pulled up in front and back.  The trial court denied defense counsel's request and allowed the kit to be called a "sexual assault kit."

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  "'We review the trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 352 . . . for abuse of discretion.'" (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480, quoting *People v. Cole* (2004) 33 Cal.4th 1158, 1198.)  We do not disturb the trial court's discretion unless the court exercised it "'"in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice."'" (*People v. Schultz* (2020) 10 Cal.5th 623, 668.)  It is defendant's burden to demonstrate both the alleged abuse of discretion and the resulting miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  The erroneous admission of evidence under section 352 is reviewed under the prejudice test of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Thomas* (2023) 14 Cal.5th 327, 373-374.)  Under the *Watson* test, it must appear reasonably probable the jury would have reached a different

result if the disputed evidence had been excluded. (*Thomas*, at p. 374.)

Defendant has not demonstrated that the court exercised its discretion in an arbitrary, capricious or patently absurd manner. In fact the court heard argument of counsel on two occasions and carefully considered its ruling, as demonstrated by the court's explanation: "So my concern is in limiting that, then it may lead to other confusing areas because the evidence is going to come out how the victim was found. Thus, a particular exam was done to try to collect evidence of which specimen came from. I don't mind if—I mean, there's follow-up questions, and I'm not sure if this would assist in what [defense counsel was] after, the follow-up questions of this exam was done because of this and that's just the name of the exam because of the area in which the exam is taking place. That's why I'm hesitant in limiting what the exam is called because it may lead to other issues depending on how the evidence comes out in trial."

Defendant has also failed to demonstrate that a different result would have been reasonably probable without calling a sexual assault kit by that name. Defendant merely gives his conclusion that the term added an emotional bias against him that was irrelevant and unnecessary to either its admission or probative value. Calling the kit by its usual name is not inherently prejudicial. (See *People v. Gray* (2005) 37 Cal.4th 168, 213 [counsel not ineffective for using the term or for not objecting to it].)

During defendant's two-week trial five criminalists and one medical examiner testified regarding evidence gathering and processing, but the term was used very little in their extensive testimony. Criminalist Castellino testified she went to the place

9

where the body was found because she was notified there was a possible body dump case warranting a sexual assault kit. She explained that a sexual assault kit contained a standard set of swabs for processing a body for "*potential* sexual assault *or* body swabs *in general*." She also explained the kit was used to gather evidence from Daisy's body because her pants were pulled down below her buttocks. Defendant has pointed to no testimony suggesting this was anything other than a *potential* sexual assault case at the beginning of the investigation.

Defendant has suggested no reason to believe that the fact a sexual assault kit was used before there was any suspect in the case somehow suggested that defendant had assaulted or raped Daisy. As the People point out, the fact that Daisy was found face-down with her pants below her buttocks and her shirt lifted up was far more suggestive of a sexual assault than the use of the term, "sexual assault kit." Thus calling the kit a "physical assault kit" or just an "assault kit" would not change the locations swabbed or the DNA findings, which along with the partially undressed condition of the body, suggested sexual assault as a possibility.

Moreover, the evidence included DNA of an unknown contributor on the knife handle, the bottom of rug, and the keys found at the scene. Defense counsel took advantage of that evidence to suggest that someone other than defendant committed the crime.

Furthermore, the overwhelming evidence of defendant's guilt precluded any reasonable probability of a different result. Compelling circumstantial evidence gives rise to a reasonable inference that Daisy died sometime between 11:30 p.m. on February 22, 2021, and 12:30 a.m. on February 23, 2021. Shortly

before 10:30 on or about the night of February 22, Juan saw a man looking into his living room window, wearing a mask, a cap, and a beanie. Although he saw only his eyes, he recognized the man as defendant, whom he knew was Daisy's boyfriend. Also, we infer from Daisy's behavior of leaving their apartment about 10 minutes later after saying she would be back that Juan's identification was accurate. In addition, later when Juan went to his room that night, he heard Daisy's voice and a male voice murmuring through the open window. Jeffrey too saw Daisy and defendant together at 11:35 p.m., though it is unknown whether Daisy was still alive then, as she lying on her side near the stairs, and Jeffrey saw defendant walk back and forth with his head down. About an hour later Jeffrey heard a dragging noise from the alley, suggesting it was the sound of the rug being dragged into the alley. This also gives rise to the reasonable inference that defendant dragged Daisy's body into the alley, noting both his and Daisy's DNA were found on the rug and the handle of the knife, as well as on a wall near Daisy's body. In sum, from about 10:30 p.m. to 11:30 p.m., Daisy was alive and with defendant, and defendant was with Daisy or her body sometime thereafter in the alley.

Defendant then disappeared. Evidence of flight immediately after the commission of a crime is relevant to show consciousness of guilt. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1054-1055.) Defendant did not return home after the night of February 22-23, which prompted his worried mother to file a missing person report just three days later. Defendant did not reply to his mother's texts or contact her for the next two weeks, and then he met her away from their home, asking for money. The inference that defendant was conscious of his guilt was

11

strengthened by his arrest at the Mexican border more than four months after Daisy was killed.

When defendant met with his mother two weeks after Daisy's death, Gutierrez asked whether he had killed Daisy. Defendant made no reply, but put his head down. "'If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

Defendant argues that the response to his mother's question was ambiguous and could either have been an adoptive admission of guilt or his frustration over his own mother suspecting him of a crime he had not committed. He also argues that his apparent flight to Mexico could have meant he was attempting to avoid arrest because he was guilty or because he was innocent and everyone including his own mother thought he was guilty. Defendant suggests that Juan and Jeffrey were mistaken in their identifications of defendant that night and that another person killed Daisy. Defendant's inferences are weak when considered under all the circumstances.

Therefore, we conclude defendant has not demonstrated a reasonable probability that the jury would have reached a different result if the sexual assault kit had been called by a different name. We also conclude that if the trial court had

12

abused its discretion in denying defense counsel's request to rename the kit, we would find any such error to be harmless.

## DISPOSITION

The judgment is affirmed.


_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
ASHMANN-GERST, J.

13